BARNETT v INTERNATIONAL TENNIS CORPORATION

1. APPEAL AND ERROR—CORPORATIONS—SHAREHOLDERS—DERIVATIVE
   ACTION—DE NOVO REVIEW—COURT RULES.

   A shareholder's derivative action, being equitable in nature, is
   reviewed *de novo* by the Court of Appeals; however, factual
   determinations made by a trial court sitting without a jury will
   not be set aside unless clearly erroneous (GCR 1963, 517.1).

2. APPEAL AND ERROR—CLEARLY ERRONEOUS FINDINGS—REVIEW OF
   ENTIRE RECORD.

   A trial court's finding is clearly erroneous where the reviewing
   court is left with a definite and firm conviction that a mistake
   has been committed after reviewing the entire record, although
   there is evidence to support the finding.

3. CONTRACTS—DURESS—WORDS AND PHRASES.

   Duress exists when one by the unlawful act of another is induced
   to make a contract or perform some act under circumstances
   which deprive him of the exercise of free will.

4. CORPORATIONS—CORPORATE DIRECTORS—FINANCING OF CORPORA-
   TION—PERSONAL GUARANTEE—DURESS.

   The refusal of a director of a corporation wholly owned by its
   four directors and officers to execute his personal guarantee for
   financing of the corporation until various terms of a manage-
   ment agreement with two of the directors met with his ap-
   proval did not constitute duress against those directors of the

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 966, 967.
[2] 5 Am Jur 2d, Appeal and Error §§ 703, 705, 772, 774, 967.
[3, 4] 17 Am Jur 2d, Contracts § 153, 463.
   25 Am Jur 2d, Duress and Undue Influence §§ 1–3.
[5] 19 Am Jur 2d, Corporations §§ 982, 1196–1208.
[6, 7] 19 Am Jur 2d, Corporations §§ 1406–1412.
[8] 19 Am Jur 2d, Corporations §§ 1354–1361.
[9] 20 Am Jur 2d, Costs § 65.
[10] 4 Am Jur 2d, Appeal and Error §§ 168–170.
   20 Am Jur 2d, Courts §§ 111–117.
[11] 19 Am Jur 2d, Corporations §§ 1613–1625, 1632, 1633.

corporation where he engaged in no illegal acts and was not legally obligated to personally guarantee the loan and where all of the directors were knowledgeable businessmen who had considered the terms of the management contract through prolonged negotiations before entering into it.

5. CORPORATIONS—CORPORATE OFFICERS—EMPLOYMENT CONTRACT—SHAREHOLDERS—THIRD-PARTY BENEFICIARIES—STATUTES.

A director-shareholder of a corporation does not have an enforceable right as a third-party beneficiary to require that an amendment to an employment contract entered into by the corporation be declared of no effect where the employment contract is a corporate contract which provides that management services are to be performed for the corporation and not for the director-shareholder, who does not satisfy the statutory requirement as a third-party beneficiary (MCLA 600.1405; MSA 27A.1405).

6. CORPORATIONS—CORPORATE OFFICERS—SALARIES.

It must be shown that additional duties have been, or are to be, assumed by a corporate officer in order to justify a major increase in the officer's salary.

7. CORPORATIONS—CONTRACTS—MANAGEMENT CONTRACT—AMENDMENT TO CONTRACT—SALARIES—CONSIDERATION.

An amendment of a corporate management contract between a corporation formed for the management of a group of tennis clubs and two of the corporation's officer-directors which doubled the annual salaries of the officer-directors was not void for lack of consideration where the language of the original management contract did not contemplate nor include services rendered by the officer-directors in the construction of additional tennis clubs and management of a tennis franchise, and where the new salaries were clearly demonstrated at trial to be reasonable.

8. CORPORATIONS—FINANCING OF CORPORATION—PERSONAL GUARANTEE—DELAY—INTEREST RATES.

A trial court's finding that a plaintiff's failure to personally guarantee a corporation's financing of construction of a corporate facility did not result in a delay in closing and in an increase in interest rates of a mortgage loan to the corporation was not erroneous where there was no record of a causal connection between the plaintiff's refusal to sign and the delay in closing and the increase in interest rate.

9. WITNESSES—EXPERT WITNESSES—FEES—TAXABLE COSTS—JUDGE'S DISCRETION—STATUTES.

Expert witness fees may be taxed as part of the taxable costs in any given case, and the taxation of expert witness fees is within the discretion of the trial court (MCLA 600.2164; MSA 27A.2164).

10. APPEAL AND ERROR—CONTEMPT—SUPERINTENDING CONTROL.

A review of a trial court's refusal to find a party in contempt can be brought about only by a complaint for an order of superintending control; therefore, a party may not seek such a review by general appeal.

11. CORPORATIONS—DISSOLUTION—ACTS OF DIRECTORS—EXCEPTIONAL CIRCUMSTANCES—STATUTES.

A circuit court may adjudge dissolution of a corporation where it is established that acts of the directors are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholders seeking judicial intervention; dissolution, however, is a last resort remedy and exceptional circumstances such as financial loss, corporate paralysis, mismanagement and deterioration of property must be proved before dissolution will be ordered; the ultimate test is whether corporate ruin will inevitably follow continuance of present management (MCLA 450.1825; MSA 21.200[825]).

Appeal from Oakland, John N. O'Brien, J. Submitted October 12, 1977, at Detroit. (Docket No. 28425.) Decided January 4, 1978.

Complaint by Robert Barnett, a shareholder and director of defendant corporation, against International Tennis Corporation, Seymour Brode, Marshall Greenspan, and Philip S. Minkin seeking restoration to the corporation of a portion of salaries paid to defendants Brode and Greenspan, dissolution of the corporation and for the corporation to buy out his shares, and for attorney's fees. Defendants counterclaimed, asking for an order that plaintiff execute a personal guarantee of a loan. The claim against defendant Minkin was dismissed at the close of plaintiff's proofs. The

court dismissed the counterclaim, ordered defendants Brode and Greenspan to repay a portion of their salaries to the corporation, and refused to dissolve the corporation or to order the corporation to buy out the plaintiff's shares. Defendants appeal, and plaintiff cross-appeals. Affirmed in part and reversed in part.

*Keywell & Rosenfeld* (by *Frederic I. Keywell, Sidney L. Frank* and *Stephen E. Handelman),* for plaintiff.

*Barris, Sott, Denn & Driker* (by *Donald E. Barris, Sharon M. Woods* and *William C. Edmunds),* for defendants.

Before: D. E. HOLBROOK, P. J., and N. J. KAUFMAN and J. E. McDONALD,* JJ.

D. E. HOLBROOK, P. J. On August 9, 1973, plaintiff Robert Barnett, shareholder and director of defendant International Tennis Corporation (ITC), successor to Franklin Racquet Club, Incorporated, filed a shareholder's derivative action seeking, *inter alia,* restoration to the corporation of a part of the salaries paid to defendants Seymour Brode and Marshall Greenspan (also shareholders and directors of the corporation), dissolution of the corporation and for the corporation to buy out his shares, and attorney's fees. Defendants counterclaimed and asked that plaintiff be ordered to execute his personal guarantee of a loan sought in connection with construction by the corporation of a new tennis facility (Centaur Farms Racquet Club). Defendants appeal from the dismissal of the counterclaim and from the court order directing them to repay part of their salaries to the corpora-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

tion and setting their salaries to $20,000 yearly. Plaintiff cross-appeals from the court's refusal to dissolve the corporation or to order the corporation to buy out plaintiff's shares.

Originally, Barnett and the three defendants, Brode, Greenspan and Philip Minkin, were associated in the Franklin Racquet Club, Incorporated and F. R. C. partnership. The defendant corporation, ITC, is a successor to these two entities. Plaintiff and the three defendants each owned 25 per cent of ITC and the former corporation. They were all directors and officers.

ITC owns and operates tennis clubs in Southfield, Michigan (Franklin Racquet Club); Bloomfield Township, Michigan (Square Lake Racquet Club); Lansing, Michigan (Greater Lansing Racquet Club); Toronto, Canada (Winfield Racquet Club); and West Bloomfield, Michigan (Centaur Farms Racquet Club). During 1973 to 1975 ITC also owned and operated a World Team Tennis franchise known as the Detroit Loves.

During 1972 arrangements were being made with the National Life Insurance Company of Vermont for the financing of the Franklin, Square Lake and Greater Lansing racquet club additions. National Life agreed to loan $2,400,000 provided plaintiff and defendants, together with their wives, agreed to personally guarantee portions of the loan. At the same time as these negotiations were being held with National Life, the parties felt there was an opportunity to be had by "going public" with their stock. Advisors suggested that there should be owner management, so Brode and Greenspan agreed to become full-time employees. This was the foundation for the contract which was ultimately signed on November 9, 1972.

On November 9, 1972, Barnett, Brode, Green-

span and Minkin signed a management contract wherein Brode and Greenspan would provide full-time management to Franklin Racquet Club, Incorporated, and each was to be paid five per cent of the profits with a minimum of $20,000 per year. The contract was for a period of four years. Barnett had refused to personally guarantee any portion of the mortgage with National Life Insurance Company unless Brode and Greenspan signed the management contract.

Barnett knew that the mortgage transaction with National Life Insurance Company was pending at the time of the November agreement but was under the impression that the closing could be postponed from the date of November 29, 1972. Minkin, one of the four directors of Franklin Racquet Club, Incorporated, felt the mortgage could not be postponed and testified that he and the other directors (Brode and Greenspan) were, in effect, forced by Barnett to sign the November agreement since otherwise Barnett would refuse to execute the guarantee of the mortgage and the corporation would lose the mortgage commitment fee of $50,000. The closing of the mortgage took place on November 10, 1972. Mr. William Liberson, corporate counsel for Franklin Racquet Club, Incorporated, was at the November meeting. He had already drafted two versions of the employment contract before the final one was signed on November 9, 1972. The terms of the agreement were, according to Liberson, negotiated and the result of heavy bargaining. Brode's testimony suggests that the November agreement was signed only as a concession to Barnett for signing the guarantee of the mortgage. On June 30, 1972, there was a board meeting at which the board had reported to it the salaries of $20,000 each of Brode

and Greenspan for the period of June 1, 1972 to June 1, 1973, which was approved. At the same meeting the board by resolution changed the name of the corporation from Franklin Racquet Club, Incorporated, to International Tennis Corporation.

Thereafter, there was a dispute as to whether or not Barnett had been approached by Brode concerning additional salaries for Brode and Greenspan. Mr. Barnett denied he was approached and Brode said he was. According to Brode, Barnett insisted on either sticking to the November agreement or being bought out. When Brode asked Barnett to attend a general meeting of the board to discuss the wages, Barnett refused. It was because of this refusal that Brode resorted to formal notice proceedings of the July 12, 1973, meeting. At the July 12, 1973, meeting of the board of directors, Brode, Greenspan and Minkin voted in favor of an amendment to the November agreement which doubled the $20,000 salaries to be paid to Brode and Greenspan. Barnett was the sole nay vote when the directors voted on the amendment.

Brode and Greenspan justified the increases in salary based on their additional duties. The "additional duties" assumed by Brode and Greenspan concern primarily work involving the *construction* of a new tennis facility and the acquisition and management of the World Team Tennis franchise, the Loves. Barnett argues that performance of these duties was contemplated in the November 1972 agreement. The board of directors had met in May of 1973 to discuss acquisition of the World Team Tennis franchise, the Detroit Loves. Barnett testified that he thought they agreed only to purchase an option to buy the franchise. He claimed that he did not find out about the purchase of the franchise until he read it in the newspaper. Mr.

Minkin, on the other hand, testified that the directors agreed to a firm commitment at the May meeting and authorized payment of $60,000 for the franchise to which Barnett agreed.

Minkin, Liberson and Thomas Garner, comptroller of defendant corporation, all testified that the World Team Tennis duties performed by Brode and Greenspan were substantial. According to Brode he spent approximately 30 hours per week in World Team Tennis duties including a great deal of out-of-town travel. Brode and Greenspan presented witnesses who testified as to the reasonableness of their amended $40,000 yearly salaries. Although Barnett testified that he attended few meetings where World Team Tennis was discussed, he agreed with the final decision to sell the franchise.

There was some discussion at the July 12th meeting concerning Barnett's desire to be bought out by the others. Barnett recalled that his fellow directors offered him $300,000 for his shares. Mr. Liberson, Mr. Minkin and Mr. Garner testified that no firm offer was made to Barnett by the other directors.

The remaining relevant facts are set out in the analysis of the appropriate issues.

The parties initially discussed the standard of review in the shareholder's derivative action. This standard was recently described by this Court:

"A shareholder's derivative action, being equitable in nature, is reviewed *de novo* in this Court. See *Dozier v Automobile Club of Michigan,* 69 Mich App 114; 244 NW2d 376 (1976). However, the *de novo* review of equity cases must be reconciled with the mandate of GCR 1963, 517.1 which states that factual determinations made by a trial court sitting without a jury will not be set aside unless clearly erroneous. In *Ford v*

*Howard,* 59 Mich App 548, 552; 229 NW2d 841 (1975), this Court explained:

   " 'It is well-settled in Michigan that although chancery cases are reviewed *de novo,* this Court does not reverse or modify unless convinced that it would reach a different result had it occupied the position of the trial court. * * * [Citations omitted.]

   " 'It is also true that, whether the action is in law or equity, principal regard must be given to the special opportunity of the trial court to judge the credibility of witnesses, and findings of fact will not be set aside unless they are clearly erroneous. [GCR 1963, 517.1.] * * * [Citations omitted.]'

A finding is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed after reviewing the entire record, although there is evidence to support the finding. *Tuttle v Department of State Highways,* 397 Mich 44; 243 NW2d 244 (1976)." *Mazur v Blendea,* 74 Mich App 467, 469; 253 NW2d 801 (1977).

The first issue is whether or not the November 9, 1972, management agreement was executed under duress and, therefore, was not enforceable against Brode and Greenspan.

In reference to the duress issue, Minkin described the November 9, 1972, meeting of the directors as unfriendly and stated that Barnett "had a gun to our heads". This was based on Minkin's feelings that the success of the corporation hinged on the execution of the National Life mortgage. Minkin was under the impression that the closing could not be postponed and, therefore, he was compelled to sign the agreement to avoid loss of the commitment fee and default on construction contract bills.

Liberson, attorney for the corporation who drafted the employment contract, testified that throughout the negotiation period, which began in the summer of 1972, the $20,000 salary remained

unchanged. He testified that the terms of the employment contract were fully negotiated and that the November 9th meeting was the scene of "heavy bargaining". Brode testified that he told Barnett at the November 9th meeting that execution of the National Life mortgage was absolutely essential to the success of the corporation. He argued that he was forced to sign the employment contract for $20,000 per year or risk the corporation's insolvency and this constituted duress, thus making the contract unenforceable.

In its January 6, 1976, opinion, the trial court acknowledged that Barnett refused to pledge his personal assets towards the necessary financing unless the employment contract was signed. However, the trial court concluded:

"All of the proofs in this regard, merely demonstrate to the Court that there was the clearest type of understanding and acceptance of the ultimate terms, regardless of their popularity.

\* \* \*

"The defendants presented many proofs to justify a larger salary for their efforts, but this Court does not feel that it is appropriate to become involved in remaking their original agreement. In order to promote a young business, it is not unusual for an equity owner to agree to work for no salary at all, their reasons are their own and their voluntary agreements should be sustained."

In *Hackley v Headley,* 45 Mich 569, 574; 8 NW 511 (1881), Justice COOLEY gave a definition of duress. "Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will."

Professor Williston in his treatise on contracts

gave the following as the basic elements of economic duress:

"1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and

"2. Such act or threat must be one which deprives the victim of his unfettered will.

"As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing. If the payment or exchange is made with the hope of obtaining a gain, there is not duress; it must be made solely for the purpose of protecting the victim's business or property interests. Finally, the party threatened must have no adequate legal remedy." 13 Williston on Contracts, § 1617, p 704.

In the instant case, the trial court ruled that Barnett engaged in no unlawful acts, and he was not legally obligated to personally guarantee the loan. Therefore, Brode and Greenspan were not induced by any unlawful act of Barnett to make a contract under circumstances which deprived them of their free will. Brode and Greenspan were knowledgeable businessmen. They had considered the terms of the contract through negotiations which had spread over a period of time. They had adequate resources and opportunities to evaluate their alternatives with respect to the management contract. As the trial court stated in its opinion, Barnett was under no obligation to execute his personal guarantee for the financing of the corporation. Thus, his refusal to execute the guarantee until various terms of the management agreement met with his satisfaction did not constitute duress against Brode and Greenspan. The trial court, after analysis of the testimony, concluded that the

action of Brode and Greenspan was voluntary. We also point out that the defendants Brode and Greenspan had requested and received a change in the original draft eliminating a severe prohibition against competition, which was amended to the advantage of defendants, and also liberalized the provision regarding the renting of an apartment for Greenspan. These changes were in the final draft. We agree with the trial court's ruling.

Another issue raised on appeal is whether the amendment of the employment contract whereby the salaries of the two managing directors of the corporation were increased to $40,000 each per year in July of 1973 was effective.

The salary provision of the November 1972 management contract was amended at a board meeting in July of 1973 by a vote of three to one. Brode, Greenspan and Minkin voted to increase the annual salaries of Brode and Greenspan from $20,000 to $40,000. Barnett dissented. As to the amendment of the salaries the trial judge held:

"In July of 1973, the two managing partners decided that they wanted a raise and convinced the third defendant to vote with them. In effect, they then amended the terms of the contract to double their salaries and subsequently increased fringe benefits.

"The defendants presented many proofs to justify a larger salary for their efforts, but this Court does not feel that it is appropriate to become involved in remaking their original agreement. In order to promote a young business, it is not unusual for an equity owner to agree to work for no salary at all, their reasons are their own and their voluntary agreements should be sustained.

\* \* \*

"Defendants have urged, in support of their right to amend the management agreement, that this was a corporation contract on November 9th, and therefore, it

can be amended by corporate action, whether plaintiff approves or not.

"This Court seriously questions whether it was a corporate contract in that sense, since there were personal undertakings involved. But even if it were, there was a third party beneficiary in the picture, to-wit: the plaintiff, and going a step further, the Corporation should not be permitted to give away a contractual benefit, to which it was entitled, whether there was a specific beneficiary or not. The shareholders are always considered by the law to be such beneficiaries.

"All salary, bonues [sic] or benefits received by defendants Brode and Greenspan, in excess of the November 9, 1972 agreement, must be returned to International Tennis Corporation."

There is no dispute that the July 1973 board meeting was properly convened, that the amendment passed by vote of three to one, and that unanimity was not required. The trial court's opinion refers to a third-party beneficiary theory and questions whether the November agreement was a corporate contract although its final decision does not seem to be based on these theories. The trial court "seriously questioned" whether the November 1972 employment contract was a corporate contract. An examination of the signature page of the agreement reveals that it was a corporate contract. *Saint Joseph Valley Bank v Napoleon Motors Co,* 230 Mich 498, 501; 202 NW 933 (1925). The form and language of the agreement disclose that the November 9, 1972, agreement was a corporate contract. A third-party beneficiary theory does not apply in the instant case as Barnett does not satisfy the statutory requirement set forth in MCLA 600.1405; MSA 27A.1405 for third-party beneficiaries. The November 9, 1972, employment contract provides that Brode and Greenspan are to perform management services for the corpo-

ration and not for Barnett. Thus, since Brode and Greenspan have not promised nor undertaken to give or do anything directly to or for Barnett, Barnett does not have an enforceable right as a third-party beneficiary.

The crucial inquiry is whether the amendment was void for lack of consideration. In order to justify the increase in a corporate officer's salary, it must be shown that additional duties have been, or are to be, assumed by the officer. 5 Fletcher on Corporations, § 2138, pp 516–518, 1 Williston on Contracts, § 130, p 531.

Brode and Greenspan argue that the increase in their salaries is justified due to the additional duties undertaken by them in connection with the *construction* of the Centaur facility and management of the Loves team. They allege that the November 1972 contract did not contemplate nor include services they rendered in *construction* of additional clubs, *i.e.,* Centaur, nor did the contract include management of the World Team Tennis team. Brode and Greenspan therefore argue that these additional duties justify the increased salaries. Barnett argues that the November employment contract is worded in a broad enough fashion so as to have included these additional duties undertaken by Brode and Greenspan. The original contract in pertinent part provides as follows:

"WHEREAS, Club is desirous of obtaining certain management services that are available and proffered by Seymour Brode, individually, hereinafter referred to as 'Brode,' and Marshall Greenspan, individually, hereinafter referred to as 'Greenspan,' both of whom have indicated that they would undertake to manage 'Club,' and,

\*   \*   \*

"IT IS AGREED as follows:

"1. That Brode and Greenspan individually covenant, agree and by this instrument do commit and contract for and on behalf of themselves to perform any and all *management services* for and on behalf of Club during the term hereinafter set forth. It is specifically acknowledged and agreed that the extent of the management required is such as to preclude any definition of the services to be performed by Brode and Greenspan with exactitude; however, it is acknowledged that the attitude and philosophy of the undertaking of Brode and Greenspan for Club is such as to require them to devote all of their time as is reasonably necessary under like circumstances, so as to produce successful, *smooth running and profitable tennis club operations, not only as they now exist, but any growth or addition thereto in the future.* Included by way of description, but not limitation, Brode and Greenspan shall have the right to hire, fire and organize the internal operation of the Club, and to do any and all things necessary and incident that *management persons* would do in similar circumstances without, however, divesting stockholders, directors or partners of those rights inherently theirs, including but not limited to the right of policy making and importation of basic philosophies to the operation of the Club." (Emphasis supplied.)

It is undisputed that the corporation changed between November of 1972 and July of 1973. Of particular significance was the acquisition of the World Team Tennis franchise and the assumption of duties incident thereto. This transaction was apparently not contemplated until after the November agreement was executed. The acquisition of the World Team Tennis franchise substantially expanded the nature of the duties to be performed by Brode and Greenspan.

Also, the November contract dealt with *management, not construction, as contractors for the building of the Centaur Farms Racquet Club,* which was also an additional duty. It is the hold-

ing of this Court that the broad language of the November agreement did not contemplate nor include the services rendered by the defendants in the *construction* of additional clubs *nor management of the World Team Tennis franchise.* The contract was for the management of racquet clubs and these other duties were not included. The management of the racquet clubs to us means management and not construction. Further, it does not include carrying on the operation of the purchase and servicing of the World Team Tennis franchise. Therefore, these additional duties provided consideration for the amendment of the salaries from $20,000 to $40,000 each per year. This Court also notes that the reasonableness of the salaries of $40,000 per year each for Brode and Greenspan was clearly demonstrated at trial. The testimony of Frank Hausemann, Jr., Wyndham Gary, John Aldworth, and Allen Schwartz amply proves that these salaries were reasonable.

A plain reading of the contract of November 1972 conclusively shows to us that our construction of the contract is correct, and the trial court's to be in error in this regard. This Court reverses the trial judge's orders that all salaries in excess of $20,000 be returned to the corporation.

An additional issue raised by defendants is whether the trial court erred in finding that plaintiff was not obligated to personally guarantee the financing of the construction of the Centaur facility and that his failure to agree to personal liability did not cause a delay in closing and the increase in the interest rates.

In August of 1972, the corporation entered into a lease for the Centaur site. In December of 1972, a mortgage commitment letter was prepared by City National Bank which conditioned the mort-

gage loan on the personal guarantees of the four directors and their wives. The commitment was to expire in May of 1973. Barnett refused to undertake personal liability, however, the closing did not actually take place until September 13, 1973. Robert Lockwood, assistant vice-president of the City National Bank, testified that the bank had not been ready to close on the original closing date. Defendants testified that the closing did not occur in May because the bank was not ready and because of a delay in construction. The original interest rate was modified upwards by one per cent in the final mortgage agreement. Defendants counterclaimed against Barnett for failure to execute a personal guarantee in the Centaur mortgage. They alleged that this failure caused the delay in closing which resulted in the higher interest rate. The trial court awarded Barnett a judgment of no cause of action on defendants' counterclaim. The trial court stated:

"Defendants have counter-claimed against the plaintiff for his failure to execute a personal guarantee on some later financing, saying that his failure caused a delay in the closing which resulted in a higher rate of interest.

"After hearing the proofs, the Court is of the opinion that his failure to agree to personal liability was not the cause of the delay in closing. Further, the plaintiff was not obliged to sign. Merely because he had done so in the past, created no obligation to do so thereafter. Indeed, his attitude of concern as expressed at the November 9, 1972, contract negotiation was a clear indication that he was seriously concerned about an unlimited pledging of personal responsibility."

We agree with the trial court and point out that according to Mr. Liberson, the corporation's attorney, the closing was postponed because the neces-

sary documents had not been prepared. Mr. Lockwood stated that there was no evidence of record as to the reason for the increased interest rate. He could not state that Barnett's refusal to guarantee the mortgage was responsible for the increase.

Thus, the record supports a conclusion that Barnett never agreed to sign the Centaur mortgage guarantee. The record is devoid of testimony suggesting a causal connection between the increase in interest rate and the failure of Barnett to assume personal liability. The facts show that the delay in closing and the increase in the mortgage rate was not caused by Barnett and his wife's refusal to sign. Mr. Lockwood, vice-president of City National Bank, testified that five or six of the requirements in the mortgage commitment were not met by May 20th, the time set for closing. There were also problems concerning the lease and mortgage. Lockwood also stated that the bank was not relying heavily on the personal guarantees of the other individuals but that Minkin's personal financial statement was the most important one to the bank. Minkin himself testified that the bank was relying upon his financial stability and was not interested in the other investors. There is substantial evidence in which to justify the trial court's finding that the failure of Barnett and his wife to sign the guarantee did not cause any damage to the corporation.

Defendants also argue that it was an abuse of discretion for the trial court to order the corporation to pay the attorney's fees of a shareholder who had brought a shareholder's derivative suit.

The trial judge ruled in favor of Barnett and ordered Brode and Greenspan to pay back to the corporation $61,827.53. The trial court also ordered the defendant corporation to pay $12,500

towards Barnett's attorney's fees. This Court has held that the trial court erred in ordering Brode and Greenspan to repay salaries exceeding $20,-000. Barnett did not succeed in whole or in part in his suit and no pecuniary benefit went to the corporation. Thus, the attorney's fees should not be awarded to Barnett. That order is set aside. See MCLA 450.1493; MSA 21.200(493).

Another issue raised by defendants is whether or not the trial court abused its discretion in denying defendants' motion to tax their costs against plaintiff more than the ordinary witness fee for defendants' expert witness.

Both plaintiff and defendants filed motions to tax the opposing party more than the ordinary witness fees for testimony of their respective expert witnesses. Both motions were argued and decided by the trial court on May 12, 1976. The trial court noted that neither party had prevailed in full and, rather than enumerate which party had prevailed on which issue, it would allow each party to pay its expert more than the ordinary witness fee, but denied the right to tax these fees as costs to the opposing party.

Expert witness fees may be taxed as part of the taxable costs in any given case. MCLA 600.2164; MSA 27A.2164. It is proper to tax as cost fees paid to the expert in connection with his or her preparation for trial. *Gundersen v Village of Bingham Farms,* 1 Mich App 647; 137 NW2d 763 (1965). The general rule is that costs are awarded in circuit court to the prevailing party. GCR 1963, 526.1. In equity, where both parties are partly successful, taxation of costs is largely discretionary. 20 CJS, Costs, §§ 12, 14; pp 281, 286. The taxation of expert witness fees is within the discretion of the trial court. *Maas Brothers, Inc v Weitzman,* 288 Mich 625; 286 NW 104 (1939), *Gundersen, supra.*

Inasmuch as defendants' counterclaim was denied, we affirm the trial court's ruling on expert witness fees.

Defendants and cross-plaintiffs were unsuccessful in their counterclaim. Cross-plaintiffs' argument that the trial judge failed to exercise his discretion is not convincing. The trial judge's decision was based on motions, oral arguments and testimony which took from June to September. He was in the best position to determine the appropriateness of taxation of costs. His decision should not be disturbed. Cross-plaintiffs' issue is without merit.

Another issue raised is whether the trial court erred in denying defendants' motion to find plaintiff in contempt for allegedly inconsistent sworn statements, and whether such denial is reviewable in a general appeal.

Cross-plaintiffs allege that Barnett made contradictory sworn statements concerning his knowledge of the construction of the Centaur facility, which is an affront to the dignity and integrity of the judicial system. Thus, the trial court erred in summarily dismissing defendants' motion to hold Barnett in contempt.

The Supreme Court has held that a review of the trial judge's refusal to find a party in contempt can only be brought about by a petition for a writ of mandamus or certiorari. *Mason v Siegel,* 301 Mich 482, 484; 3 NW2d 851 (1942). Presently, this action would be classified as a complaint for an order of superintending control. GCR 1963, 711.3, *Shelby Twp v Liquid Disposal, Inc,* 71 Mich App 152, 154; 246 NW2d 384 (1976). Under the above authority cross-plaintiffs may not seek by general appeal to review the order of the trial court refusing to punish for contempt.

The final issue deals with the court's dismissal of Barnett's count II. The issue was whether or not the trial court erred in finding that the actions of the directors of defendant corporation were not willfully unfair and oppressive to the corporation and that, therefore, neither dissolution nor buy-out should be ordered.

Count II of Barnett's complaint alleged willfully unfair and oppressive conduct on the part of the board of directors of ITC and asked for dissolution of the corporation or a buying out of Barnett's shares. The trial court found in favor of defendants on this count. The court noted that there was dissension among the shareholders, financial loss in connection with the acquisition of the World Team Tennis franchise, lack of formality in accounting and carelessness in the running of the corporation. However, the trial judge determined that there was no corporate paralysis, no deadlock, no mismanagement, no deterioration of corporate property and no accounting inaccuracies. The totality of circumstances do not indicate conduct so severe as to call for judicial intervention. We agree.

Barnett lists several "facts" in support of his position as to the defendants' willfully unfair and oppressive conduct. As pointed out by defendants, however, these alleged facts are not conclusively proven. They are each refuted by testimony of the witnesses. The trial judge as trier of facts was obligated to determine the credibility of the various witnesses and was in the best position to do so. Barnett's argument that the judge failed to consider the effect of the alleged misconduct of defendants is not supported by the record. The court considered the totality of the circumstances. Be-

cause this is a closely held corporation, Barnett, as shareholder and director, is affected by corporate action as directly as the corporation is affected. The court found that because of the informal character of the corporation, its actions were proper and acceptable to all.

MCLA 450.1825; MSA 21.200(825) authorizes the circuit court to adjudge dissolution of a corporation when it is established that the acts of the directors are illegal, fraudulent or willfully unfair and oppressive to the corporation or to the shareholders seeking judicial intervention. Additionally, the court may order that the directors responsible for the wrongful acts buy out the complaining shareholder.

As dissolution is a very drastic measure, it is considered a last resort remedy. It is necessary to prove exceptional circumstances before dissolution will be ordered. These include financial loss, corporate paralysis, mismanagement and deterioration of property. The ultimate test is whether corporate ruin will inevitably follow continuance of present management. *Stott Realty Co v Orloff,* 262 Mich 375; 247 NW 698 (1933), *Levant v Kowal,* 350 Mich 232; 86 NW2d 336 (1957). Absent a clear abuse of discretion, the trial court's ruling will not be disturbed.

The trial court's finding that exceptional circumstances were not present in the instant case is not clearly erroneous. The evidence shows that the corporation is a valuable entity with a potentially bright future, with values greatly in excess of the money advanced by the parties. Judicial dissolution was properly denied.

Reversed in part and affirmed in part. No costs, neither party prevailing fully.