**In re Lynne C. ROCHKIND, Debtor.**

**Bankruptcy No. 90–04916–R.**

United States Bankruptcy Court, E.D. of Michigan.

June 6, 1991.

Leonard Peres, Waterford, Mich., for debtor.

Franklin Gettleson, Birmingham, Mich., for Mr. Lippitt.

David W. Allard, Trustee.

## ORDER DENYING MOTION TO LIFT STAY

STEVEN W. RHODES, Bankruptcy Judge.

### I.

Norman C. Lippitt has filed a motion to lift the stay under 11 U.S.C. § 362(d)(1) and § 362(d)(2), for the purpose of pursuing foreclosure on a second mortgage he holds on the debtor's residence. Mr. Lippitt contends that the debtor, Lynne Rochkind, and her husband, Sanford Rochkind, are in default on an obligation of approximately $100,000 owed to him.

Mrs. Rochkind opposes the motion, and contends that the note and mortgage on which Mr. Lippitt relies are not enforceable against her for two reasons. First, she contends that there was no consideration for either the note or the mortgage. Second, she contends that Mr. Lippitt coerced her into signing the note and the mortgage.

The trustee, David W. Allard, also opposes the motion.

The facts and circumstances resulting in this dispute are as follows:

Mr. Lippitt and Mr. Rochkind are both practicing attorneys. While Mr. Rochkind was in law school, he worked as a law clerk in Mr. Lippitt's law office. After Mr. Rochkind graduated from law school and was admitted to the bar in 1981, he worked as an associate attorney for Mr. Lippitt. Sometime after that, they became partners in the practice of law. In September of 1985, Mr. Lippitt was appointed as a Circuit Judge on the Oakland County Circuit Court. At that time, they entered into an agreement regarding the payment of fees to be earned in the future on pending cases in their office.

Thereafter, pursuant to that agreement, Mr. Rochkind paid Mr. Lippitt substantial sums of money for fees owing. However, as of February of 1987, Mr. Rochkind owed Mr. Lippitt $75,000, which he could not pay.[1]

---

1. Apparently, Mr. Lippitt had allowed and encouraged Mr. Rochkind not to pay him the fees when Mr. Rochkind received them; rather, Mr. Lippitt requested Mr. Rochkind to hold the funds until he requested them, apparently for tax reasons.

On February 14, 1987, Mr. and Mrs. Rochkind signed a note in the amount of $75,000, and a second mortgage on their home to secure the debt. These are the second mortgage and note that are presently at issue.

## II.

■■■ As noted, Mrs. Rochkind contends that the note and mortgage that she signed are unenforceable against her for lack of consideration. Specifically, she contends that she received nothing of value in exchange for signing the note and mortgage, because she had not previously been liable to Mr. Lippitt. In support, she cites *Cummings v. Continental Machine Tool Corp.*, 371 Mich. 177, 123 N.W.2d 165 (1963). In that case, the plaintiff gave a worthless property interest to the defendant in exchange for a note and mortgage. The court held that the note and mortgage were unenforceable for lack of consideration. However, that case did not involve the liability of married persons on obligations jointly undertaken, and is therefore inapplicable to the present case.

Mr. Lippitt contends that Mrs. Rochkind signed as an accommodation, and that in these circumstances, Michigan law does not require separate consideration to Mrs. Rochkind. In support, Mr. Lippitt cites a number of decisions, including *Manufacturers National Bank of Detroit v. Pink*, 128 Mich.App. 696, 341 N.W.2d 181 (1983); and *Citizens Commercial & Savings Bank v. Raleigh*, 159 Mich.App. 110, 406 N.W.2d 479 (1987).

In *Manufacturers National Bank of Detroit v. Pink*, the enforceability of a note and mortgage signed by the defendant husband and wife was at issue. Before the note and mortgage were signed, the husband was obligated to the bank on an unsecured loan. To renew the loan, the bank demanded that both the husband and wife sign the renewal note and a mortgage on jointly held property. The court stated, "No separate consideration ran to Cypora Pink's estate." 128 Mich.App. at 698, 341 N.W.2d 181. Nevertheless, the court held, "[A] married woman can be bound by contracts executed by her and her husband even though no consideration passes to her estate." 128 Mich.App. at 700, 341 N.W.2d 181. This Court notes that the facts of *Pink* are indistinguishable from the facts of the present case.

In *Pink*, the court relied upon *Michigan National Leasing Corp. v. Cardillo*, 103 Mich.App. 427, 302 N.W.2d 888 (1981). In that case, the defendant husband and wife had jointly guaranteed a lease. The court affirmed the wife's liability on the guarantee, stating, "[A]ppellant's defense, that she received no consideration inuring to her separate estate, is without merit." 103 Mich.App. at 435, 302 N.W.2d 888.

In *Citizens Commercial & Savings Bank v. Raleigh*, the bank sued the defendant wife on a charge card account which was in the names of both the husband and wife. The trial court had instructed the jury that the wife was liable only to the extent that her separate estate was benefitted by the charge card debt. The jury found for the wife, but the Court of Appeals reversed, holding that there was no such limitation of liability under law in connection with obligations jointly undertaken by married persons. 159 Mich.App. at 117.

■■■ These cases make it clear that under Michigan law, obligations jointly undertaken by married persons do not require separate consideration to the estate of each. Accordingly, the Court concludes that Mrs. Rochkind's contention the note and mortgage are not enforceable on the ground that she did not receive separate consideration must be rejected.

## III.

■■■ As noted, Mrs. Rochkind also contends that the note and mortgage are not enforceable against her due to duress.

## A.

The Court held an evidentiary hearing concerning the circumstances leading to

the signing of the note and mortgage, and heard testimony from Mr. and Mrs. Rochkind, Mr. Lippitt, and Mr. Franklin D. Gettleson, who was Mr. Lippitt's attorney. That testimony is in substantial conflict.

### 1.

Mrs. Rochkind testified that she vividly remembers receiving a telephone call at home from Mr. Lippitt, shortly before signing the note and mortgage. She testified that Mr. Lippitt, who was a judge at the time, asked her, "Where's that husband of yours?" and that he was screaming and swearing at her, and calling her husband names. He stated several times that he wanted his money. He also stated, "I can ruin him" and, "I'm influential." She responded by asking Mr. Lippitt to direct his questions about money to her husband. She testified that this conversation was very upsetting and left her crying. When Mr. Rochkind came home, she told him what had happened.

She further testified that sometime later, her husband spoke to her about signing a mortgage, and he told her that unless they did that, he could not practice law. Mrs. Rochkind stated that she signed the note and mortgage on February 14, 1987, because she was afraid that her husband would not be permitted to practice law again in Oakland County.

### 2.

Mr. Rochkind testified that his last conversation with Mr. Lippitt occurred 10–14 days before the note and mortgage were signed on February 14, 1987. It was a telephone conversation in which Mr. Rochkind recalls Mr. Lippitt stating,

> "Listen, son of a bitch, mother f_____, if you don't make arrangements, I'm going to have your ass. Judges up here listen to me. They are my friends. They will give you no consideration. You will not be able to make a living. I fixed Victor Baum's ass."

Mr. Rochkind testified that these statements made him nauseous, and that he discussed them with his wife. He stated that he and his wife signed the note and mortgage so that he could continue to practice law.

On cross-examination, Mr. Rochkind conceded that he had been discussing a mortgage with Mr. Gettleson, for some time before it was actually signed, and that it was mentioned in certain letters between them. However, Mr. Rochkind stated that he participated in discussions concerning a mortgage only to buy time to pay the debt.

Mr. Rochkind also testified to a conversation with Mr. Gettleson at the end of 1986 in which Mr. Gettleson indicated that Mr. Lippitt was losing patience, and that he could not wait because he had a large tax obligation for 1986. Mr. Rochkind also testified that in one of a number of later conversations, Mr. Gettleson stated that Mr. Lippitt can get crazy, that Mr. Lippitt does not take this lightly, that Mr. Lippitt can carry out his threats, that Mr. Lippitt is influential, and that Mr. Rochkind should not test him.

Finally, Mr. Rochkind testified that at the signing of the note and mortgage, his state of mind was "like at a funeral," and that there was no conversation.

### 3.

Mr. Lippitt testified that in one of several telephone conversations with Mrs. Rochkind, he was upset, because he could not get a return call from Mr. Rochkind. However, Mr. Lippitt does not recall using profanity. He testified that he did not make any threats to Mrs. Rochkind.

Mr. Lippitt further testified that 1–1½ years *after* the note was signed, he had a conversation with Mr. Rochkind, witnessed by Mr. Gettleson, in which he said, "Do you think you can fail to honor your obligations to me and still practice law in this county?" Mr. Lippitt testified that he regrets having made this statement, and does not know what he meant by it.

Mr. Lippitt testified that he retained Mr. Gettleson after Mr. Rochkind disclosed that his money was gone, and he was not satisfied with Mr. Rochkind's accounting. Mr.

Lippitt authorized Mr. Gettleson to negotiate an arrangement with Mr. Rochkind that if the debt was secured, Mr. Rochkind could pay any amount, perhaps interest only.

Mr. Lippitt denied making any statement to Mr. Rochkind about Victor Baum. He testified that Victor Baum was a Circuit Judge in Wayne County, and that he wrote a law review article concerning Judge Baum in the University of Detroit Law Journal.[2]

Regarding the phone conversation with Mrs. Rochkind, Mr. Lippitt recalled asking her, "What's wrong with Sandy?" He also recalled telling her that Mr. Rochkind owes him a lot of money. He recalled that she was upset, but he insists that he was not rude, and did not use improper language.

#### 4.

Mr. Gettleson testified that the crucial conversation to which Mr. Rochkind testified did not take place at the time he stated. Rather, it took place in the fall of 1987 or during 1988, after the note and mortgage were signed. Mr. Gettleson was present during the call and heard Mr. Lippitt say, "Do you think you can get away without paying me, and still practice here?"

Mr. Gettleson testified that Mr. Rochkind had settled several personal injury suits without telling them. Mr. Gettleson further testified that he tried to get the information, without success, angering Mr. Lippitt.

Mr. Gettleson testified that when the note and mortgage were signed, the demeanor was businesslike, without hostility or animus. He testified that neither Mr. Rochkind nor Mrs. Rochkind protested, and that there was no discussion. Finally, he testified that Mrs. Rochkind was not visibly upset.

#### 5.

Basically, Mr. and Mrs. Rochkind testified that they signed the note and mort-

gage because Mr. Lippitt, while an Oakland County Circuit Judge, was abusive toward them and threatened to use the power and influence of his judicial position to deprive Mr. Rochkind of his ability to provide for his family. On the other hand, Mr. Lippitt and Mr. Gettleson testified that Mr. Lippitt made no such threat or remark, at least not until well after the note and mortgage were signed, and that there was therefore no duress or coercion. The testimony is therefore in conflict as to both the nature and the timing of Mr. Lippitt's conduct.

The Court concludes that Mr. and Mrs. Rochkind more likely testified to the truth concerning the nature and timing of Mr. Lippitt's threats. The Court so concludes based largely upon the demeanor of the witnesses while testifying as witnesses; Mr. and Mrs. Rochkind simply impressed the Court as the more believable witnesses. The Court was especially impressed with the credibility of Mrs. Rochkind.

The Court has also considered the other factors that are naturally and properly taken into account in determining the facts, including the witnesses' biases and interests, but has concluded that these factors are roughly equally weighed and provide little or no basis for decision.

Accordingly, the Court credits the testimony of Mr. and Mrs. Rochkind and finds that Mrs. Rochkind signed the note and mortgage because Mr. Lippitt abused them and threatened their livelihood in the ways that they testified.

#### B.

The law of duress in Michigan was recently summarized by Judge Cohn of the United States District Court for the Eastern District of Michigan in *Kelsey–Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F.Supp. 794, 796 (E.D.Mich.1990):

---

2. *See N. Lippitt,* Running the Gauntlet of Criminal Defense, 60 Univ. of Det. Journal of Urban Law 169 (Winter 1983). In this article, Mr. Lippitt describes and criticizes Judge Baum's

conduct in the case of *People v. Gallagher,* 116 Mich.App. 283, 323 N.W.2d 366 (1982). Mr. Lippitt represented the defendant in that case.

Courts in Michigan have recognized the doctrine of economic duress or "business compulsion" for more than a century. *Hackley v. Headley,* 45 Mich. 569, 8 N.W. 511 (1881). Galtaco relies on early statutory and judicial general expressions of the doctrine stating that in order to make a claim of duress, a person must be subjected to the threat of an unlawful act in the nature of a tort or a crime. *See Burke v. Gould,* 105 Cal. 277, 281–283, 38 P. 733 (1894). However, the doctrine of duress has been greatly expanded since its common-law origin.[5] Now, a contract is voidable if a party's manifestation of assent is induced by an improper threat by another party that leaves the victim no reasonable alternative. *Rich & Whillock v. Ashton Development,* 157 Cal.App.3d 1154, 204 Cal.Rptr. 86, 89 (1984); *Systems Technology Associates, Inc. v. United States,* 699 F.2d 1383, 1387 (Fed.Cir.1983); Restatement (Second) of Contracts, § 175(1) (1982). In other words, economic duress can exist in the absence of an illegal threat; the threat must merely be wrongful. Even acts lawful and non-tortious may be wrongful depending on the circumstances. S. Williston & W. Jaeger, *Williston on Contracts* § 1606 (3rd ed. 1972); *Fowler v. Mumford,* 48 Del. 282, 102 A.2d 535 (Del.Super.1954).

---

[5] A survey of Michigan cases involving duress reveals that there has never been a decision that explicitly adopts the modern formulation of duress. *See Stefanac v. Cranbrook Educational Community,* 435 Mich. 155, 194 n. 40, 458 N.W.2d 56 (1990) (Levin, J., dissenting) (recognizing that despite the general enlargement of the doctrine of duress, the law in Michigan may have lagged behind); *Apfelblat v. National Bank Wyandotte–Taylor,* 158 Mich. App. 258, 263–264, 404 N.W.2d 725 (1987) (per curiam) (duress is defined as requiring compulsion or coercion by one which is "illegally" forced to act by fear of serious injury to person, reputation or fortune).

A superficial reading of the few Michigan decisions indicates that, while the dimensions of the duress doctrine have expanded in other jurisdictions, Michigan courts continue to apply the restrictive principles of the early common-

law. The decisions routinely cite *Hackley,* in which the Michigan Supreme Court states that a threat must be unlawful, not merely wrongful, in order for there to be duress. In these cases, the courts' inquiries have consistently focused on whether the coercing party engaged in unlawful acts. *Barnett v. International Tennis Corp.,* 80 Mich.App. 396, 405, 263 N.W.2d 908 (1978); *Apfelblat,* 158 Mich.App. at 264, 404 N.W.2d 725; *Beachlawn Building Corp. v. City of St. Clair Shores,* 370 Mich. 128, 121 N.W.2d 427 (1963); *Norton v. State Highway Department,* 315 Mich. 313, 320, 24 N.W.2d 132 (1946); *Lafayette Dramatic Productions, Inc. v. Ferentz,* 305 Mich. 193, 216, 9 N.W.2d 57 (1943).

Nevertheless, the Court is satisfied that if the Michigan Supreme Court looked at the issue today, it would rule that economic duress need not stem from an "illegal" threat. No Michigan decision affirmatively states that Michigan has rejected the modern interpretation of economic duress. In fact, a recent case interpreting Michigan law held that economic duress can flow from a "wrongful or unlawful" act. *Transcontinental Leasing, Inc. v. Michigan National Bank of Detroit,* 738 F.2d 163, 166 (1984). Also, Michigan decisions cite with apparent approval Professor Williston's treatise on contracts which states that a claim of economic duress can be based on a perpetrator's "wrongful" act. *See Barnett v. International Tennis Corp.,* 80 Mich.App. at 406, 263 N.W.2d 908 (citing 13 S. Williston on Contracts, § 1617, p. 704 (3rd ed. 1972)). Thus, while the Michigan Supreme Court has not explicitly embraced the modern interpretation of economic duress, there is no reason to believe it would not do so if presented with a fact pattern requiring its consideration. *See Dunbar v. United States Insurance Co. of America,* 557 F.Supp. 228 (E.D.Mich.1983) (in diversity cases, federal court must make educated guess what state Supreme Court would decide if question was presented to it, and decisions of state trial and appellate courts, while they may be considered, cannot serve as precedent).

## C.

■ It requires no extended discussion to conclude that Mr. Lippitt's conduct was wrongful if not unlawful. Indeed, Mr. Lippitt does not contend otherwise. To threaten to use the power of public office to ruin another for personal gain plainly violates several provisions of the Michigan Code of Judicial Conduct, including Canons 1, 2, 3

and 5.[3] This conduct may also constitute a crime under M.C.L.A. § 750.213.[4]

Therefore, the Court concludes that Mr. Lippitt's conduct in obtaining Mrs. Rochkind's signature on the note and mortgage was wrongful if not unlawful.

### D.

Finally, the Court concludes that it was indeed Mr. Lippitt's wrongful conduct that caused Mrs. Rochkind to sign the note and mortgage. His abusive conduct toward her plainly convinced her that his threats were not idle threats, but rather to be taken very seriously. And she was also convinced, based both on Mr. Lippitt's judicial office and on her husband's position in the matter, that Mr. Lippitt could very well carry out his threats. The Court concludes that Mrs. Rochkind was deprived of her free will and was left with no choice but to assume this obligation and pledge her home as security.

Accordingly, the Court concludes that Mrs. Rochkind has met her burden of establishing that she signed the note and mortgage under duress imposed by Mr. Lippitt and that therefore neither the note nor the mortgage is enforceable against her. Therefore, the motion to lift stay should be denied.

IT IS SO ORDERED.

---

3. Canon 1—"A judge should uphold the integrity and independence of the judiciary."

Canon 2—"A judge should avoid impropriety and the appearance of impropriety in all his activities."

Canon 3—"A judge should perform the duties of his office impartially and diligently."

Canon 5—"A judge should regulate his extra-judicial activities to minimize the risk of conflict with his judicial duties."

*See also* the comments to these Canons.

4. M.C.L.A. § 750.213 makes it a crime to "maliciously threaten any injury to the person or property ... of another with intent thereby to extort ... any pecuniary advantage whatever...."