**In re Lynne C. ROCHKIND, Debtor.**

**Bankruptcy No. 90–04916–R.**

United States Bankruptcy Court,
E.D. Michigan.

March 6, 1992.

Rogue Tyson, Royal Oak, Mich., for debtor.

Michael Lewiston, Detroit, Mich., for creditor.

## ORDER GRANTING MOTION TO LIFT STAY

STEVEN W. RHODES, Bankruptcy Judge.

### I.

Norman C. Lippitt has filed a motion to lift stay for the purpose of pursuing a foreclosure on a second mortgage he holds on Mrs. Rochkind's residence. In an order entered on June 6, 1991, the Court denied the motion on the ground that the mortgage had been obtained by duress and was therefore not enforceable. *In re Rochkind,* 128 B.R. 520 (Bankr.E.D.Mich.1991).

Subsequently, Mr. Lippitt filed a motion for relief from the June 6, 1991 order, contending in part that the proofs should be reopened to allow him to present newly discovered evidence. After a hearing, the Court granted that aspect of the motion, and ordered further discovery and a new evidentiary hearing.

The Court has now conducted this new evidentiary hearing, and has heard the new evidence proffered by Mr. Lippitt, as well as rebuttal evidence proffered by Mrs. Rochkind. For the reasons indicated below, the Court now concludes that the mortgage was not obtained by duress, that it is therefore enforceable, and that therefore the motion to lift stay should be granted.

### II.

In this Court's opinion of June 6, 1991, the factual issues relating to Mrs. Rochkind's contention of duress were set forth as follows:

Basically, Mr. and Mrs. Rochkind testified that they signed the note and mortgage because Mr. Lippitt, while an Oakland County Circuit Judge, was abusive toward them and threatened to use the power and influence of his judicial position to deprive Mr. Rochkind of his ability to provide for his family. On the other hand, Mr. Lippitt and Mr. Gettleson testified that Mr. Lippitt made no such threat or remark, at least not until well after the note and mortgage were signed, and that there was therefore no duress or coercion. The testimony is therefore in conflict as to both the nature and the timing of Mr. Lippitt's conduct.

128 B.R. at 524.

Neither party had submitted any corroborating evidence regarding when the threatening call was made. Each party largely relied on the memory of the witnesses. The Court thus resolved the conflict in the testimony based upon its evaluation of the credibility and demeanor of the witnesses. The Court found in favor of Mrs. Rochkind, stating:

The Court concludes that Mr. and Mrs. Rochkind more likely testified to the truth concerning the nature and timing of Mr. Lippitt's threats. The Court so concludes based largely upon the demeanor of the witnesses while testifying as witnesses; Mr. and Mrs. Rochkind simply impressed the Court as the more believable witnesses. The Court was especially impressed with the credibility of Mrs. Rochkind.

128 B.R. at 524.

### III.

#### A.

At the new evidentiary hearing, Mr. Lippitt presented the testimony of Nazli Sater,

who worked as a research attorney for Mr. Lippitt from July of 1986 until November of 1988, while Mr. Lippitt was an Oakland County Circuit Judge. At present, Ms. Sater works as an associate attorney for Mr. Lippitt's law firm.

She testified that on July 12, 1991, Mr. Lippitt told her about this Court's June 6, 1991 opinion and about a newspaper article that was about to be published regarding it. He told her that the opinion dealt with an issue of coercion and a heated conversation in which he had been involved. At that time, Ms. Sater told Mr. Lippitt that she had been a witness to a heated telephone conversation which had occurred in Mr. Lippitt's office, involving Mr. Lippitt and Mr. Rochkind, sometime between November of 1987 and January of 1988. Thereafter, Ms. Sater prepared one of the affidavits that Mr. Lippitt filed in support of his claim of newly discovered evidence.

Ms. Sater also recalled that two others had also overheard the heated conversation, Eugene Ingrao, the courtroom clerk, and Donna Smigelski, the secretary. Ms. Sater then located Captain Ingrao, currently in the United States Army, and arranged for him to sign an affidavit in support of Mr. Lippitt's position.

Regarding the heated conversation, Ms. Sater testified that she could hear Mr. Lippitt shouting through the closed door to his office. He was shouting louder than she had ever heard him. She heard him say, "Why are you avoiding me? Why are you avoiding paying? Sandy, what's wrong? I helped you. How can you fail to pay and practice in Oakland County?" During the call, Ms. Smigelski told Ms. Sater that Mr. Lippitt was speaking to Mr. Rochkind. Ms. Sater knew that this call had followed several unsuccessful attempts to reach Mr. Rochkind and that Mr. Lippitt was frustrated by this. She does not recall hearing any curse words during the call, or anything about a mortgage or about Judge Baum.

After the call, the door to Mr. Lippitt's office was opened and he came out along with Mr. Gettleson. At that time, and until July 12, 1991, there was no discussion of what had happened.

### B.

Captain Ingrao testified that he worked as a court clerk for Mr. Lippitt from May of 1987 until January of 1989. He also recalls the heated conversation, and recalls that during the call, Ms. Smigelski told him that the judge was talking to Sandy Rochkind. That was the first time that he had heard of Mr. Rochkind, and he was not then aware of any problems that the judge was having with Mr. Rochkind. Captain Ingrao could not recall who was present other than Ms. Smigelski. He heard nothing of the nature of the conversation, except he did hear swearing and curse words. He could not state when this occurred, except that it was sometime after he started.

### C.

In rebuttal, Mrs. Rochkind called Donna Smigelski to testify. Ms. Smigelski testified that she worked as a secretary for Mr. Lippitt from October of 1985 through December of 1989 while he was a judge. She also recalled the loud conversation that Mr. Lippitt had with Mr. Rochkind. She did not know when the call took place, or who else was present, or the content of the conversation. She does recall thinking to herself at the time that the judge's voice was so loud that they must hear it down at Judge Gage's office at the other end of the hall.

She also knew that Mr. Rochkind owed money to the judge, although she never asked the particulars. She knew that the judge was talking to Mr. Rochkind because she had placed the call, and that this call involved money and business rather than anything else. She also knew that Mr. Lippitt had previously been trying, unsuccessfully, to reach Mr. Rochkind, and that the judge was upset about this. She knew that the judge thought that Mr. Rochkind was dodging him and not living up to his financial obligations.

She does not recall telling anyone at the time who the judge was talking to, but she did testify that if she had been asked, she

would have told Nazli Sater and Eugene Ingrao who it was.[1]

## IV.

Based on this new evidence, Mr. Lippitt argues that the heated conversation must have taken place after February 14, 1987, when Mrs. Rochkind signed the mortgage. In support, Mr. Lippitt relies on Ms. Sater's testimony that the call occurred later in 1987 or in early 1988, and on Captain Ingrao's recollection of a heated call after he started work in May of 1987. Mr. Lippitt also notes that the mortgage of February 14, 1987 followed a series of letters between the parties, and meetings noted in these letters, negotiating the terms of a mortgage. Thus, he argues that until well after the mortgage was signed, there was no period of time (culminating in this heated call) when Mr. Lippitt could not reach Mr. Rochkind. This conclusion, Mr. Lippitt argues, was corroborated by Ms. Sater and Ms. Smigelski.

Mrs. Rochkind responds to the new evidence by attacking its credibility. Her attorney notes that Ms. Sater has been associated professionally with Mr. Lippitt for most of the past five years. Counsel also argues that it is strange that Ms. Sater had no detailed conversation with Mr. Lippitt concerning her recollection for two weeks after July 12, 1991, when she first recalled the event. He also notes that some factual details disclosed in her deposition were inconsistent with her trial testimony.

Counsel also argues that neither Captain Ingrao or Ms. Smigelski could testify to what they heard during the heated conversation, and that it is too coincidental that of the three, only the witness with the present connection to Mr. Lippitt—Ms. Sater—is willing, or able, to testify as to the content of the heated conversation.

In sum, Mrs. Rochkind argues that the new evidence was fabricated in an effort to reverse the results of the prior hearing and to save Mr. Lippitt's reputation.

## V.

■ Obviously, the Court has decided the factual issues once already. Because the proofs were later reopened, an issue arises concerning how to weigh the new evidence in light of the prior findings. The Court concludes that the interests of justice would be best served if the Court made an entirely new decision based upon a fresh look at the evidence. Accordingly, the Court concludes that the issue presently before it is whether, considering all of the evidence, it is more likely than not that the mortgage was signed due to duress.

Thus, the issue is not whether the new evidence is sufficient to change the earlier findings. The Court's earlier findings are not entitled to any presumption of correctness which must be overcome by Mr. Lippitt. Indeed, the Court concludes that its earlier findings are not to be accorded any particular weight at all.

---

1. Mrs. Rochkind also called Gloria Rose to testify. She is a supervisor in the court administrator's office in the Oakland County Circuit Court. In response to a subpoena, she brought to court an exhibit which established that on August 12, 1991, the phone bills of the court for 1987 and the first three quarters of 1988 were destroyed, along with other court records of similar age. She testified that the authorization to destroy these documents, and the destruction itself, took place pursuant to a regular program of record disposal, which is necessary because of the court's limited storage space. She also testified that the Michigan State Court Administrator's office issues rules about the length of time for holding court records, and must approve each records destruction. In addition, this destruction was approved by Oakland Circuit Judge Richard Kuhn, Chief Judge Pro Tem, acting in place of Chief Judge Steven Andrews.

This testimony was offered by Mrs. Rochkind in a futile effort to link Mr. Lippitt to a willful destruction of key evidence—phone records which might show when Mr. Lippitt called Mr. Rochkind. In support, Mrs. Rochkind notes that Judge Kuhn is a friend of Mr. Lippitt, and that these phone records were destroyed just before Mr. Lippitt filed his motion for relief from the June 6, 1991 order.

In the Court's view, this effort totally failed. There was simply no basis to conclude that Judge Kuhn, acting at the request of, or in support of, Mr. Lippitt, ordered the destruction of the phone records. Rather, the evidence clearly establishes that this ordinary administrative matter was carried out in the normal course of business by the court administrator's office.

## VI.

Having reviewed the evidence anew, the Court now concludes that it is more likely that the telephone call in which Mr. Lippitt threatened Mr. Rochkind occurred after the mortgage was signed, and that therefore the mortgage was not signed under duress.

The primary grounds for this conclusion are that Captain Ingrao did not start working at the Oakland County Circuit Court until May of 1987, after the mortgage was executed, and he obviously overheard the threatening phone call sometime later.

In order for the Court to find that there was a threatening call before February 14, 1987, as asserted by Mrs. Rochkind, the Court would have to find either:

(1) that the call overheard by Captain Ingrao was a second call involving Mr. Rochkind, preceded by one which took place before February 14, 1987; or

(2) that the call overheard by Captain Ingrao did not involve Mr. Rochkind (and was preceded by one with Mr. Rochkind which took place before February 14, 1987); or

(3) that Captain Ingrao did not overhear a heated phone call, as he and Ms. Sater testified.

The first alternative—that there was more than one threatening call involving Mr. Rochkind and Mr. Lippitt—is unsupported by the evidence. Mr. Rochkind, Mr. Lippitt, Mr. Gettleson, and Ms. Smigelski each stated that there was only one such call, and no other witness testified otherwise.

The second alternative—that the call overheard by Captain Ingrao did not involve Mr. Rochkind—is also unsupported by the evidence.

It is certainly true that Captain Ingrao was not able to testify as to the content of the heated conversation that he overheard, or even that it involved Mr. Rochkind. But that connection was provided by Ms. Sater, and to a lesser extent by Ms. Smigelski. Ms. Sater specifically recalled the content of the conversation, that it involved Mr. Rochkind, and that Captain Ingrao was present.

In order to find that the heated conversation that Captain Ingrao and Ms. Sater overheard did not involve Mr. Rochkind, the Court would have to find that the testimony of both witnesses lacks credibility. Nevertheless, after carefully considering the demeanor and the potential biases and interests of these witnesses, the Court concludes that both witnesses were entirely credible. Both testified in an open, forthright, and confident manner, and were careful to testify to only what they recalled.

As noted, counsel for Mrs. Rochkind attacks Ms. Sater's credibility on the grounds of bias and inconsistencies between her deposition and trial testimony. Certainly, Ms. Sater's professional association with Mr. Lippitt is a substantial consideration; nevertheless, she is no more biased for Mr. Lippitt than Mr. Rochkind is for his wife. Indeed, each of the witnesses has some natural bias for one party or the other. Ultimately, the Court concludes that this consideration provides no basis upon which to distinguish the credibility of Ms. Sater from that of any other witness.

Moreover, the inconsistencies between Ms. Sater's deposition testimony and her trial testimony cause no concern regarding her credibility. Some inconsistencies are always to be expected; indeed, it would be suspicious if there were none whatsoever. And, the differences were of a minor nature, not dealing with the substance of Ms. Sater's recollections from 1987.

The third alternative—that Captain Ingrao did not overhear any heated conversation involving Mr. Lippitt—requires the Court to find that his testimony lacks credibility. However, the Court finds that his testimony was credible, for the reasons indicated above, and that he did overhear a heated conversation involving Mr. Lippitt, along with Ms. Sater and Ms. Smigelski.

■ Considering all of the evidence, the Court now concludes that it is more likely that Captain Ingrao, Ms. Sater, Mr. Lippitt and Mr. Gettleson, rather than Mr. and Mrs. Rochkind, testified to the truth con-

cerning the timing of Mr. Lippitt's threats to Mr. Rochkind.[2]

In its earlier opinion, the Court relied heavily upon the demeanor of Mrs. Rochkind in crediting her testimony. Based on the evidence then proffered, the Court found her recollection the most reliable. Now, as then, the Court has no doubt that Mrs. Rochkind testified to the facts and her feelings as she remembered them. But it now appears that the facts were other than as she testified on the key issue of the timing of Mr. Lippitt's threats. As noted earlier, it is the Court's responsibility to make a new determination based on all of the evidence presented.

Accordingly, the Court concludes that the mortgage was not executed under duress, that the mortgage is enforceable, and that the motion to lift stay should be granted.

It is so ordered.

**2.** As noted earlier, Mr. Lippitt also asserts that further evidence that the heated conversation took place after the mortgage was signed is found in the letters exchanged by the parties leading up to the mortgage. Specifically, Mr. Lippitt notes that these letters contain no suggestion of coercion, and no lengthy period of time when Mr. Rochkind could not be reached. The Court concludes that these letters are equivocal and do not by themselves lend any particular weight to Mr. Lippitt's position. The best that can be said about them for him is that nothing in them is inconsistent with his position.