# STATE OF MICHIGAN

# COURT OF APPEALS

JEREMY JAMES NOWAK,

        Plaintiff-Appellee,

v

KRISTEN ANGELA NOWAK,

        Defendant-Appellant.

UNPUBLISHED
August 23, 2018

No. 339541
Manistee Circuit Court
LC No. 16-016141-DO

Before: MURPHY, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right a judgment of divorce, which incorporated a property settlement agreement and was entered following a two-day evidentiary hearing addressing defendant's arguments that the settlement resulted from coercion and duress and was also unconscionable. The trial court rejected defendant's arguments, and she challenges those rulings on appeal. We affirm.

Plaintiff and defendant were married on July 9, 2011, and separated on December 23, 2016. The parties do not have children in common, but defendant has a minor child, RK, from a previous marriage. On December 23, 2016, the parties signed a handwritten property settlement agreement, and on December 27, 2016, the parties executed a typed version of the property settlement agreement. Plaintiff filed a complaint for divorce on December 28, 2016, followed by a motion for entry of proofs and judgment on February 9, 2017, after defendant had signed a proposed consent judgment of divorce the previous day, which incorporated the settlement agreement. Despite having signed the proposed divorce judgment, defendant filed an answer to the divorce complaint on February 28, 2017, and on March 2, 2017, she filed a response to plaintiff's motion for entry of proofs and judgment, along with a motion to restore her possession of the marital home. Defendant claimed that her signatures on the handwritten and typed property settlement agreements "were the direct result of duress and coercion" that first arose on December 23, 2016. She also set forth arguments premised on unconscionability.

The parties disputed the crucial facts surrounding a confrontation that took place on December 23, 2016. They agreed that plaintiff had picked defendant up from a store on that date to go to the parties' business, Bob's Roofing Company, Inc., which plaintiff was operating and where defendant had been working in the office for about seven months. The parties then left the company grounds. And while in the process of plaintiff driving defendant back to where her

-1-

vehicle was located, plaintiff confronted defendant about an extramarital affair. The parties agreed that they were in the car for approximately two hours, which was longer than the 10 or 15 minutes it ordinarily would have taken to return defendant to her car. There was agreement that plaintiff made a series of phone calls while in the car.

Plaintiff claimed that, while in his vehicle, the parties talked about separation and divorce, focusing on his relationship with RK. Plaintiff contended that, at one point, the parties parked for about 15 to 20 minutes, during which time they discussed and agreed how the marital property would be divided. Plaintiff testified that defendant did not request any specific property and that she "just wanted out." Plaintiff described the conversation in the car as "fairly calm." He claimed that the phone calls he made were business-related; he believed he made about 13 phone calls, including to his parents, defendant's parents, and RK's father. Plaintiff testified that he never prevented defendant from leaving the car and that he drove her back to her car approximately an hour and 45 minutes into the drive, doing so as soon as defendant requested to be taken to her car.

Defendant claimed that the parties never parked and that plaintiff prevented her from getting out of the car. Defendant contended that plaintiff was "upset," "bitter, angry, and degrading," that plaintiff made about 50 phone calls, and that the calls all concerned defendant's affair. Defendant testified that plaintiff "threatened to shoot himself in the head in front of [RK] so that [she] would have to live with the guilt for the rest of [her] life." Defendant agreed that the parties had discussed property division, but described the conversation as "[plaintiff] talking and telling [her] how it was going to be, and [her] sitting there helpless in the car." Defendant testified that during the car ride, plaintiff told her that she was "done" working at Bob's Roofing.

The parties eventually returned to the marital home, where RK was present. The parties agreed that plaintiff brought the parties' gun safe, where they stored their two guns, into the kitchen, but they disagreed about what occurred thereafter. Plaintiff claimed that, because he could no longer trust defendant, he accessed the safe in order to store and lock away some business debit and credit cards and keys. Plaintiff testified that he did not load either gun or put bullets in the clips. Defendant, however, testified that plaintiff loaded one of the guns while they were arguing and that she never saw him put anything other than the guns in the safe. Defendant maintained that she was fearful that plaintiff "would follow through with his threat to shoot himself in the head in front of [RK]." RK testified that, while he did not see plaintiff handle or load the guns, he observed plaintiff putting bullets in a clip and later saw the clip in a gun. On cross-examination, plaintiff admitted that "it probably wasn't a smart move" to access the gun safe at that time; however, he wanted to place the other items in the safe, as it was "the only lockable thing" in their home.

According to defendant, she called her parents while the gun safe was out. Defendant's father testified that, on a scale of 1 to 10, with 10 being the most afraid, defendant was at an "11," and he had never heard his daughter so upset and fearful. Defendant's mother testified that defendant indicated that plaintiff was loading a gun, and she described her daughter as being "upset and afraid." Despite these allegations, neither parent considered calling the police. Defendant did not contact the police about the incident until March 1, 2017, over two months after it took place.

According to defendant, plaintiff eventually put the gun back in the safe without unloading it. Both parties agreed that the safe opened by use of a fingerprint code and that plaintiff changed the code so that defendant could not access its contents. Defendant called RK's father, who came and picked RK up from the marital home. The parties concurred that, soon thereafter, defendant left the house to take some clothes to RK and was gone for about an hour and a half before returning home. According to plaintiff, while defendant was gone, he started writing up the property agreement that they had discussed earlier in the car. Plaintiff described the agreement as a "give and take."

Defendant testified that there "wasn't much of a conversation" with respect to the agreement. She testified that, even though RK was no longer home while the parties drafted the property settlement agreement, she was still concerned about RK because he was "accessible to [plaintiff] at any time." Defendant indicated that she signed the agreement, as she believed that "doing what [plaintiff] said was going to protect [RK], because he was going to keep that gun away from his head or away from [RK]." When asked whether the concern for the gun was "substantially minimized" once plaintiff put it away, defendant stated, "You may feel it's minimized, but the fear and the truth of that loaded gun being there was still real to me, and I felt that I needed to do whatever [plaintiff] wanted me to do to keep that threat at bay."

Both parties signed the handwritten property agreement that evening.[1] After they signed the agreement, plaintiff took defendant's house keys and garage door opener, and defendant went to a hotel. Defendant claimed that plaintiff removed the keys from her purse and took the garage door opener out of her car. Plaintiff admitted that he took the garage door opener out of defendant's car, but claimed that defendant voluntarily gave him the keys.

Plaintiff brought the handwritten agreement to the office of his attorney, who used it to prepare a formal, typed settlement agreement, which apparently was mostly consistent with the handwritten agreement. The agreement provided that defendant would receive $20,000 in cash "as an equity offset." The agreement indicated that the $20,000 "represented all the cash on hand." Further, plaintiff was to have exclusive possession of the marital home until September 2017, at which time the house was to be placed for sale, with the parties equally dividing the net proceeds from a sale. The agreement additionally provided that plaintiff would receive real property that the parties had recently purchased, along with the debt associated with that property.[2] Under the agreement, the parties were to retain any retirement benefits they had accrued, no spousal support was to be paid, bank accounts and investments had already been divided, and defendant was awarded a Jeep Grand Cherokee. The agreement contained an acknowledgement that plaintiff would file a divorce action and that the property settlement

---

[1] It appears from the transcript of the evidentiary hearing that the handwritten settlement agreement of December 23, 2016, was admitted into evidence; however, it is not included in the lower court file sent to this Court.

[2] Defendant testified that the parties had $40,000 in savings and that $20,000 was spent as a down payment on this property. She indicated that the $20,000 plaintiff was to pay her represented half of the $40,000 that had been in the bank.

agreement would be incorporated into the judgment of divorce entered in the action. Finally, the settlement agreement awarded plaintiff a "100% interest in the shares of stock, ownership, management, etc. of Bob's Roofing Company." And it further provided that defendant "shall have no interest in . . . Bob's Roofing Company." Plaintiff was to be responsible for all indebtedness related to the company, and defendant acknowledged that she was no longer an employee of the company. With respect to the company, there was little financial information presented during the trial and nothing in regard to valuation. Defendant testified that she estimated that the company had close to $3 million in sales between April and December 2016, that at the end of 2016, the company had $300,000 in "excess cash," and that the company had some debt. No specific monetary amount was placed on the debt. Defendant had worked in the office of the company, earning about $50,000 a year, while plaintiff received a salary of approximately $78,000.

The parties agreed to go to a bank on December 27, 2016, in order to formally sign the agreement and have it notarized. The parties exchanged a large number of text messages between December 23 and 27, 2016, none of which questioned the validity or contents of the agreement. Although the text messages concerned the minutia and logistics typically associated with a couple going through the process of separation, the messages were generally amicable in nature. Plaintiff even offered to get more cash for defendant on December 27th if she needed it. On defendant's inquiry, plaintiff informed defendant that it was not necessary for her to obtain an attorney of her own. Plaintiff explained at the evidentiary hearing that he believed they only needed an attorney to make the agreement legal and that defendant did not need an attorney, given that the typed agreement contained the same contents as the handwritten agreement.

Prior to the parties having the typed settlement agreement notarized, plaintiff sent defendant a picture of the complaint for divorce, which indicated that counsel for plaintiff was the attorney who had prepared the agreement and that defendant was "in pro per." Defendant later claimed that she did not know what "in pro per" meant and that plaintiff told her that "it would be ugly" if she retained an attorney. Defendant believed that the "it would be ugly" statement by plaintiff was intended as a threat by him to use his gun and commit suicide in front of RK. Despite the fact that defendant had been through an earlier divorce, she claimed that she believed that plaintiff's attorney was representing both parties.

There was testimony by the person with whom defendant had engaged in the affair, which affair had now ended, and he testified about communications that he had with defendant on December 23, 2016. The witness stated, "We talked after she left her home, and she told me that they drove around and went back . . . [to the marital home] and wrote up an agreement and then she left." When asked whether defendant mentioned anything about a gun or signing the settlement agreement against her will, the witness answered, "No," to both questions. He further testified that he told defendant that he believed the agreement was fair. Additionally, there was evidence that RK spent time alone with plaintiff a few days after Christmas 2016. And in response to texted photographs from plaintiff to defendant showing plaintiff and RK spending time together, defendant texted, "I'm happy to have him spend time with you."

The parties signed the typed agreement at a bank on December 27, 2016, as planned, and it was notarized. The notary public testified that the parties were "solemnly calm" and that it seemed as if they were "just confirming what they had talked about prior." Defendant testified

that she only signed the settlement agreement because she "desperately" needed money and because she believed that it was "too late" to change her mind considering that she had already signed the December 23, 2016 handwritten agreement. Defendant executed a quit-claim deed regarding the real estate that she had agreed would go to plaintiff, along with an employment termination agreement relative to defendant's discharge from the company. The quit-claim deed and termination agreement were signed by defendant on December 27, 2016. On the same day, defendant received a check from plaintiff in the amount of $20,000.

After the divorce complaint was filed by plaintiff, defendant signed a proposed consent judgment of divorce on February 8, 2017, which incorporated the settlement agreement. However, after plaintiff moved for entry of proofs and judgment, defendant filed an answer to the complaint and later proceeded to challenge the terms of the settlement agreement. As reflected in the above discussion, defendant on three different dates – December 23 and 27, 2016, and February 8, 2017 – signed her name showing agreement to the property settlement before deciding to challenge the settlement.

At the conclusion of the evidentiary hearing, the trial court took the matter under advisement and subsequently issued a written opinion. The court initially set forth the procedural background of the case, followed by a recitation of the law regarding settlement agreements, coercion, and duress. Next, the trial court examined the handwritten agreement executed on December 23, 2016. The court discussed at some length the nature of the evidence and the competing testimony with respect to the events surrounding the preparation and signing of the handwritten agreement. The court then noted that, as the finder of fact, it was tasked with assessing the credibility of the witnesses. And the trial court proceeded to find "that [defendant] did not sign the December 23, 2016 settlement under duress or coercion." The court found "[t]roubling" that, despite defendant's description of a hostile incident and her parents' knowledge of plaintiff's behavior as conveyed to them by defendant, neither defendant nor her parents attempted to call 911. The court then ruled:

> Furthermore, this [c]ourt finds that [defendant] voluntarily returned to the residence after taking [RK] clothing. Accordingly, this [c]ourt finds that any duress that had existed at the time of the incident had ceased when [defendant] left the residence. As such, this [c]ourt finds that [defendant] had an opportunity for "investigation, consideration, consultation, and reflection" and was not deprived of her free will when entering into this agreement.

We construe the court's ruling in regard to the events of December 23, 2016, as seriously questioning defendant's description of plaintiff's conduct and behavior, but the court appears to then proceed on an assumption that duress had existed in the midst of the confrontation, ceasing, however, when defendant left the marital home, which was prior to her return and the execution of the agreement.

The trial court next specifically addressed the typed settlement agreement signed on December 27, 2016, at the bank. The court ruled that "[h]aving heard all the evidence, this [c]ourt finds that [defendant] did not sign the December 27, 2016 settlement agreement under duress or coercion." The trial court recounted events and communications between the parties leading up to December 27, 2016, along with the circumstances surrounding the execution of the

agreement at the bank, including the remarks made by the notary public in her testimony. The court noted that the parties had engaged in "regular contact." The trial court indicated that it was not persuaded by defendant's arguments that she only signed the agreement because she desperately needed the money, having no home or income, that she believed plaintiff's attorney also represented her, and that plaintiff warned of matters turning ugly if she retained her own counsel. Regarding defendant's claims about having no home, the court observed that defendant had stayed at a hotel for a couple of days and had also stayed at her parents' home. The trial court further indicated that defendant's exclusion from the marital home was the result of her voluntary agreement that plaintiff alone could reside at the home for a period of time. The court found defendant's "testimony regarding her financial desperation to be exaggerated." The court concluded this section of its opinion by ruling that "[g]iven the testimony, this [c]ourt finds that [defendant] was not deprived of her free will when signing the property settlement agreement on December 27, 2016."

The trial court next examined the proposed consent judgment of divorce signed by defendant on February 8, 2017, finding that it "was not entered into as a result of duress[,] [as defendant] had sufficient time for 'investigation, consideration, consultation, and reflection' between December 27, 2016[,] and February 8, 2017."

Finally, the trial court considered the issues of procedural and substantive unconscionability. The court ruled that the agreement was not procedurally unconscionable because, given the circumstances, defendant "was not in a situation where she had no realistic alternative to the agreement." And the court additionally ruled that "[e]ven had the [d]efendant demonstrated procedural unconscionability, [d]efendant's unconscionability claim would fail because this [c]ourt is not satisfied that it was presented with sufficient evidence to rule whether substantive unconscionability is present." Defendant now appeals.

On appeal, defendant argues that the property settlement agreement was entered into under duress and coercion and that enforcing the agreement was procedurally and substantively unconscionable. The determination by a trial court concerning the validity of a party's consent to a settlement agreement will not be overturned on appeal absent an abuse of discretion. *Rettig v Rettig*, 322 Mich App 750, 754; 912 NW2d 877 (2018); *Vittiglio v Vittiglio*, 297 Mich App 391, 400; 824 NW2d 591 (2012). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Rettig*, 322 Mich App at 754. The trial court's underlying "factual findings are reviewed for clear error." *Vittiglio*, 297 Mich App at 400; see also MCR 2.613(C). "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re LaFrance Minors*, 306 Mich App 713, 723; 858 NW2d 143 (2014). We defer to the trial court's assessment of the credibility of witnesses. *Rettig*, 322 Mich App at 754; see also MCR 2.613(C).

Defendant first argues that "[t]he trial court erred in ruling that using felonious kidnapping, assault with a loaded gun, and conversion of [defendant's] personal firearm, are legally acceptable ways to induce [a] signature on a settlement agreement, so long as the person threatened has an hour or so after such events for 'investigation, consideration, consultation, and reflection.' " This argument is focused on the handwritten settlement agreement signed on December 23, 2016.

"It is a well-settled principle of law that courts are bound by property settlements reached through negotiations and agreement by parties to a divorce action, in the absence of fraud, duress, mutual mistake, or severe stress which prevented a party from understanding in a reasonable manner the nature and effect of the act in which she was engaged." *Vittiglio*, 297 Mich App at 400 (quotation marks omitted). Whether duress or coercion exists in a particular case is a question of fact. *Norton v State Hwy Dept*, 315 Mich 313, 319; 24 NW2d 132 (1946). "Coercion" is the application of physical or moral force against another so as to constrain her to do something against the person's will that she would not otherwise have done. *Id.* at 319-320. "Duress" entails constraint or compulsion by which an individual is forced to do or forbear some act. *Id.* at 319. Duress has also been described as "existing when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will." *Id.* at 320 (quotation marks omitted). Here, the trial court quoted language from *Payne v Cavanaugh*, 292 Mich 305, 308; 290 NW 807 (1940), wherein our Supreme Court stated that "[d]uress will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection."

With respect to defendant's argument concerning the events of December 23, 2016, she fails to appreciate that the trial court plainly questioned her credibility regarding her account of plaintiff's conduct on that day, which behavior defendant argues constituted kidnapping, assault, and conversion. We defer to the trial court's credibility assessments. MCR 2.613(C); *Rettig*, 322 Mich App at 754. That said, as indicated earlier, the court appeared to analyze the issue of duress and coercion on December 23, 2016, from the perspective of accepting or assuming that plaintiff had created a coercive, stressful environment when he was allegedly handling the firearm, but that environment ceased to exist once defendant left the marital home, which was before she signed the agreement on that date. We are not unsympathetic to defendant's argument calling into question the trial court's view that any coercive environment sufficiently dissipated within an hour or two. Had the events transpired as claimed by defendant, it would certainly be reasonable to conclude that such a horrifying experience would still be fresh on her mind a short time later, calling into question the validity of her signature. The problem that exists for defendant, however, is that she not only signed the agreement on December 23, 2016, she executed the typed agreement a few days later and the proposed consent divorce judgment more than a month later. We move on to defendant's execution of the typed December 27, 2016 settlement agreement.

With respect to the agreement dated December 27, 2016, defendant argues that "[t]he trial court erred in ruling that [defendant] was not under financial duress where, as here, she signed the second . . . property settlement agreement in order to get enough money to survive, when, solely due to [plaintiff's] manifestly unjust and purposely oppressive actions, she had no job, no money, and no place for herself or her son to live, and had no choice but to sign the second property agreement embodying the same terms as the one she had signed after being criminally threatened."

Duress can exist when a party is illegally coerced or compelled to act because of fear of serious injury to one's fortunes. *Farm Credit Servs of Mich's Heartland, PCA v Weldon*, 232 Mich App 662, 681; 591 NW2d 438 (1998). "Fear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted

-7-

unlawfully." *Id.* at 681-682 (quotation marks omitted). "In order to void a contract on the basis of economic duress, the wrongful act or threat must deprive the victim of his unfettered will[,]" and "the party threatened must not have an adequate legal remedy available." *Hungerman v McCord Gasket Corp*, 189 Mich App 675, 677; 473 NW2d 720 (1991). As a direct result of a wrongful or unlawful act or threat that deprives the victim of her unfettered will, "the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing." *Barnett v Int'l Tennis Corp*, 80 Mich App 396, 406; 263 NW2d 908 (1978) (quotation marks omitted).

Defendant's argument is essentially that she signed the agreement on December 27, 2016, only because she was in desperate need of cash, the $20,000, due to plaintiff's actions. However, the trial court found that defendant's "testimony regarding her financial desperation [was] exaggerated." The court noted that defendant never even applied for unemployment benefits and that she was able to stay at a hotel or with her parents after leaving the marital home. The court concluded that defendant "was not deprived of her free will when signing the property settlement agreement on December 27, 2016." We cannot conclude that the trial court erred in these findings. Further, to the extent that the trial court did not find defendant credible regarding her claim of financial desperation, we defer to that credibility assessment. Moreover, defendant's son, RK, was able to stay at his father's residence. Indeed, RK testified that he was now living with his father, although defendant had lots of parenting time. And defendant apparently had no concerns about RK spending time with plaintiff, which included a trip to Las Vegas in February 2017. Additionally, had defendant, who previously went through a divorce, not signed the agreement and proceeded with the divorce litigation, she likely would have been entitled to temporary spousal support from the trial court considering her economic situation in relation to plaintiff's financial circumstances. For purposes of economic duress, the record contains no evidence that plaintiff engaged in any *unlawful* act in procuring defendant's signature on the December 27, 2016 settlement agreement.

Moreover, there needed to be proof of a disproportionate exchange of values. *Barnett*, 80 Mich App at 406. Based on the arguments and the record, the claimed disproportionality arising from the settlement agreement primarily relates to Bob's Roofing, which entire interest was awarded to plaintiff. Although the company may have had $3 million in sales for part of 2016, and apparently there was $300,000 in "excess cash," whatever that exactly means, there was no evidence showing the amount of debt owed by the company, nor was a valuation produced. On cross-examination, defense counsel did not even ask plaintiff a single question regarding the financial status of Bob's Roofing.

There was also significant evidence that defendant did not sign the agreement on December 27, 2016, out of duress, *economic or otherwise*.[3] The amicable text messages and communications between defendant and plaintiff covering the period from December 23 to December 27, 2016, the testimony of the notary public and person with whom defendant was

---

[3] Buried in defendant's argument regarding economic duress is a claim that she was also still acting out of duress associated with plaintiff's alleged behavior on December 23, 2016.

having an affair, and the evidence showing RK having interactions with plaintiff, absent intervention or concern by defendant, all reflected that defendant was freely and willingly entering into the agreement on December 27, 2016. The trial court did not err in finding that defendant was not coerced into signing the settlement agreement and that she was not acting under duress.

We also point out that there was evidence that during the period between December 27, 2016, and February 8, 2017, when defendant signed the proposed consent judgment incorporating the property settlement agreement, she was behaving and conducting herself in a manner inconsistent with her alleged fearfulness. Again, related credibility assessments were for the trial court to make. We emphasize that defendant effectively signed the settlement agreement three times in a period of a month and a half. In *Vittiglio*, 297 Mich App at 400-401, this Court ruled:

> Plaintiff averred in an affidavit that defendant had threatened to kill her on more than one occasion in the past. However, the settlement agreement was reached through mediation, during which plaintiff was represented by counsel and the mediator conducted "shuttle diplomacy," which entailed the parties not even being in the same room. Plaintiff never claimed that defendant had threatened her into agreeing to the settlement. The day after she filed an affidavit relating her extreme fear of defendant, she moved to dismiss on the ground that she wished to reconcile with defendant. While these two things are not necessarily mutually exclusive, and we recognize that extricating one's self from a domestic violence situation is often exceedingly difficult and sometimes fraught with actions that are seemingly baffling to outsiders, under the particular circumstances of this specific case we find no support in the record for plaintiff's claim that defendant's prior threats affected the validity of her consent to the settlement agreement, particularly because of the method of mediation used in this case.

In the instant case, there was evidence that any duress that perhaps had existed in the past tied to the December 23, 2016 handwritten agreement had dissipated by the time defendant executed the proposed consent divorce judgment on February 8, 2017, and the trial court's ruling to that effect was not clearly erroneous. Defendant posits that she signed the proposed consent judgment because she believed that she had no other choice, having already executed the settlement agreement on two occasions. This argument is belied by the fact that shortly thereafter she challenged the validity of the prior signings.

Defendant next complains that the trial court, for purposes of judging coercion and duress, did not properly take into consideration defendant's belief that plaintiff's attorney also represented defendant, as well as plaintiff's threat of matters getting ugly if she retained counsel. Defendant asserts that the trial court deemed those factors irrelevant. The trial court acknowledged defendant's claim that she thought that counsel represented both parties and her assertion that plaintiff warned her against retaining counsel, but the court was not persuaded by her contentions. The trial court noted that a photograph of the divorce complaint was sent to defendant before she signed the property settlement agreement on December 27, 2016, and that it "clearly indicate[d]" that the attorney solely represented plaintiff. It is quite clear that the trial court did not find credible defendant's claim that she believed that she was represented by

counsel, and we defer to that credibility determination. Furthermore, that particular issue would not have advanced defendant's coercion and duress arguments even accepting her testimony.

With respect to plaintiff dissuading defendant from obtaining counsel, the trial court evidently gave it little to no weight in the grand scheme of analyzing coercion and duress. Defendant asserted that plaintiff's comment about things becoming ugly if she retained counsel was a veiled threat, hearkening back to the suicide threat. But this assertion was undermined by defendant's conduct and her communications with plaintiff, including defendant's apparent approval of plaintiff spending time with RK. To the extent that the issue implicated a credibility assessment by the court, we defer to the court's determination. And to the extent that the trial court found that, even if plaintiff made the "ugly" remark, it did not overcome the evidence reflecting that there was no coercion or duress, we cannot conclude that the court's factual findings on the lack of coercion and duress were clearly erroneous.

Finally, defendant argues that the trial court erred when it found that the property settlement agreement was not unconscionable. We disagree.

In order for a court to determine that an agreement was unconscionable, there must be both procedural unconscionability and substantive unconscionability. *Vittiglio*, 297 Mich App at 403. Procedural unconscionability arises when the weaker party to a settlement agreement had no realistic alternative but to accept the agreement. *Id*. at 404. "Substantive unconscionability exists where the challenged term is not substantively reasonable." *Id*. The challenged term "must be more than merely disadvantageous"; its inequity must be "so extreme as to shock the conscience." *Id*. (quotation marks omitted). In *Vittiglio*, this Court found that an agreement was not procedurally unconscionable where the plaintiff "was not under any obligation to accept the settlement agreement" and she could have chosen to proceed to trial. *Id*. The *Vittiglio* panel also ruled that the agreement was not substantively unconscionable, given that, even if the plaintiff's portion of the marital estate was "less than half of the mathematical value of the marital estate," it could not be said that she received such an inequitable distribution that the agreement was unconscionable. *Id*.

In this case, the court ruled that the settlement agreement was not procedurally unconscionable because, given the circumstances, defendant "was not in a situation where she had no realistic alternative to the agreement." And the court additionally ruled that "[e]ven had the [d]efendant demonstrated procedural unconscionability, [d]efendant's unconscionability claim would fail because this [c]ourt is not satisfied that it was presented with sufficient evidence to rule whether substantive unconscionability is present."

First, with regard to procedural unconscionability, defendant had the realistic alternative of litigating the divorce in an attempt to receive an award that included division of Bob's Roofing. And considering the economic circumstances of the parties, defendant would likely have been entitled to an award of attorney fees to assist her in covering the expenses of the action. See MCR 3.206(C).

Second, with respect to substantive unconscionability, the trial court was absolutely correct in its determination that it was not presented with adequate evidence to find that the settlement agreement was unconscionable. As discussed earlier, the record was woefully lacking

in evidence concerning the value of Bob's Roofing and the extent of its debt. Defendant has not shown that the settlement agreement shocks the conscience. Reversal is unwarranted.

Affirmed. Having fully prevailed on appeal, we award plaintiff taxable costs under MCR 7.219.

/s/ William B. Murphy
/s/ Elizabeth L. Gleicher
/s/ Anica Letica