STOTT REALTY CO. v. ORLOFF.

1. CORPORATIONS—DISSOLUTION—WHEN EQUITY COURT MAY DISSOLVE CORPORATION.

In certain exceptional cases, such as relieving from fraud or breach of trust, court of equity may, in its inherent power, wind up affairs of corporation as incident to adequate relief, but in absence of such exceptional circumstances, equity court, in its inherent power, may not dissolve corporation, wind up its affairs, and, for that purpose alone, sequester its property.

2. SAME—DISSOLUTION NOT TO BE LIGHTLY DECREED.

Dissolution is not remedy to be lightly decreed; court having ample power in other ways to give relief for substantially all corporate ills.

3. SAME—COURT MAY PROTECT RIGHTS OF STOCKHOLDERS WITHOUT DISSOLUTION.

Equity court may restrain or compel corporation and its officers to lawful conduct, and, ordinarily, protect stockholders in all their rights without dissolution.

4. SAME—TEST OF DISSOLUTION.

Ultimate test of dissolution is that, with any other remedy, corporation cannot be made to function for purpose of its creation.

5. SAME—TEST OF FAILURE OF CORPORATE PURPOSE.

Test of failure of corporate purpose is whether ruin will inevitably follow continuance of management.

6. SAME—MINORITY STOCKHOLDERS NOT ENTITLED TO DISSOLUTION IN
ABSENCE OF FRAUD.
    Where acts of majority stockholders needing correction, such as
    failure to hold stockholders' meetings, could be remedied by
    ordinary processes of court, and there is no showing of fraud,
    remedy of dissolution should not be granted at instance of
    minority stockholders.

7. SAME—SALARY OF PRESIDENT AS REASON FOR DISSOLUTION.
    Minority stockholders are not entitled to remedy of dissolution
    because salary is paid to president, where it was regularly
    voted, and is not shown to be excessive.

8. SAME—CORPORATE LOANS AS REASON FOR DISSOLUTION.
    Nor may dissolution be granted because of corporate loans to
    other corporations in which all parties are interested, where
    they were sanctioned by all parties.

9. SAME—INCOMPETENT MANAGEMENT—MISTAKES.
    In suit by minority stockholders for dissolution of corporation,
    evidence *held*, insufficient to show that management by major-
    ity stockholders was incompetent, although mistakes may have
    been made, due to inability to foresee business depression.

10. SAME—RIGHTS OF MINORITY TO DETERMINE POLICIES.
    It is not law that minority stockholders have right to determine
    policies of corporation, as against will of majority.

11. SAME.
    That policies of minority stockholders did not prevail is no
    evidence of incompetent management on part of majority,
    especially where record indicates that said policies were more
    obstructive than constructive.

12. EVIDENCE—JUDICIAL NOTICE—ARCHITECT'S ESTIMATES.
    It is common knowledge that building costs more than architect
    represents.

13. CORPORATIONS—DISSOLUTION—FAILURE OF CORPORATE PURPOSE.
    Where record shows that corporation is going concern, that its
    business is profitable, and that its ruin or loss to stockholders
    is not inevitable, although it is in serious difficulties because
    of dissent of minority stockholders, corporate purpose has not
    failed, and minority stockholders are not entitled to remedy of
    dissolution.

Appeal from Wayne; Ferguson (S. Homer), J. Submitted October 31, 1932. (Docket No. 149, Calendar No. 36,829.) Decided April 4, 1933.

Bill by Stott Realty Company, a Michigan corporation, and others against Julia Stott Orloff and others for appointment of temporary receiver. Cross-bills by defendants against plaintiffs for dissolution of plaintiff corporation. Decree for cross-plaintiffs. Plaintiffs appeal. Reversed, and bill and cross-bills dismissed.

*Friedman, Meyers & Keys,* for plaintiff company.

*Thomas A. E. Weadock,* for plaintiff David E. Stott.

*Henry C. Walters (Walters, Carmichael & Head,* of counsel), for plaintiffs Bertha A. Stott and Ethel Stott Kingsley.

*Lucking, Van Auken & Sprague,* for plaintiff Eleanor M. Power.

*Butzel, Levin & Winston* and *Lightner, Hanley, Crawford & Dodd,* for defendant Orloff.

*Edward N. Barnard,* for defendant Arthur F. Stott.

FEAD, J. This is appeal from decree dissolving the Stott Realty Company, a corporation.

In 1916, David Stott died, leaving a large estate, including controlling interests in several corporations. Among them was the Stott Realty Company, his stock in which he left in trust for his four daughters, Bertha, Eleanor, Ethel, and Julia, and his three sons, David, Ernest, and Arthur. After a time, the trust was closed and the corporate shares divided

among the beneficiaries in practically equal amounts. They have all the stock except six shares belonging to Thomas Danahey, the general manager of the corporation.

The capital stock is $750,000. The corporation owns several business and office buildings, other real estate and land contracts. Rents constitute almost its whole income. At David Stott's death the assets were worth $2,000,000. In 1929 their value was $8,000,000 or over. The properties were substantially the same, but with some remodeling of buildings. The enhancement in worth was due largely to increase in real estate values in Detroit. Management conserving the estate was also a factor. Dividends of 16 per cent. annually have been paid regularly until 1929, when, after payment of eight per cent., further dividends were suspended because of business conditions. In 10 years, earnings increased $175,000 per year. The figures are not definite, but it appears that in 1929 the corporation earned about $100,000, and probably more in 1930.

In 1928, the corporation began the erection of the 35-story David Stott building. It cost $2,400,000. It was mortgaged for $1,300,000. About $725,000 of the cost was borrowed from the Detroit Savings Bank, $150,000 secured by mortgage on the Arcadia property, and the balance unsecured. In 1929 the Detroit Savings Bank called the loans, commenced suit, and garnisheed the tenants of the corporation.

On November 1st a meeting of the stockholders of the Stott Realty Company was called, and various proposals of financing the bank claims discussed. Because of the condition of the real estate market, a majority favored a mortgage upon the Rayl property, which had been authorized by the board of directors in August. Julia, Ernest, and Arthur

voted against a mortgage, thereby defeating it, because the statute requires approval of two-thirds of the stock. They presented no feasible plan of financing. November 29th, in the absence of Julia and Ernest, who were directors, but from whom the plan was concealed, the board of directors authorized commencement of this suit. The bill was for appointment of a temporary receiver, with hope of authority to execute a mortgage. Julia, Ernest, and Arthur filed cross-bills praying dissolution of the corporation. The court refused to appoint a temporary receiver.

The Detroit Savings Bank proceeded with its suits against the Stott Realty Company, finally had judgments and sold and bid in the Rayl property, worth $1,000,000, for $275,000; the Lincoln building, worth $650,000, for $140,000; the David Stott building, appraised at $1,000,000 over the mortgage, for $1; and the Arcadia property, worth $550,000 subject to the mortgage, for $135,000. The sales were had in March and July, 1930. The bank also foreclosed the Arcadia mortgage and bid in the property for $154,000 in April, 1930.

In January, 1931, the court appointed a temporary receiver to save the property sold on execution and mortgage sales. Ernest withdrew his cross-bill and expressed willingness to approve a mortgage. Negotiations for a mortgage loan were had but were not completed before expiration of the periods of redemption. David, Bertha, Eleanor, Ethel, and Ernest advanced $40,000 to secure from the bank an extension of 60 days to redeem. Julia and Arthur refused to pay or pledge their proportion of the cost of the option.

The mortgage was negotiated, and the property saved to the corporation. David, Bertha, Eleanor

and Ethel are comakers with the corporation on the notes for $750,000. Plaintiffs then asked leave to withdraw their bill of complaint and for discharge of the receiver. The court refused the prayer and proceeded to hearing on Julia's and Arthur's cross-bills for dissolution.

The testimony took a wide range, running back many years, and included the affairs of other corporations in which the parties were interested. The record contains 2,430 pages, but the briefs are exhaustive, counsel have made excellent digests of the testimony and logical division of the case into subjects, and have presented their contentions in a definite and readable form. We wish to express our appreciation of the briefs.

The record depicts a course of family controversy and dissension, beginning before the death of the father and continuing to the present, characterized by ill-will, accusations, recriminations, extensive and expensive litigation, and physical violence. So far as it affects the Stott Realty Company, much of the dissension has been between David E. Stott and Arthur, and has arisen out of David's desire to keep the corporation intact and rule it and Arthur's desire to divide it into individual ownership. In their differences, David usually has been supported by Bertha, Eleanor, and Ethel, Julia is often on the side of Arthur, and Ernest is rather independent.

Were the suit between David and Arthur personally, much of the testimony would merit discussion. But if it were all reviewed, the conclusion necessarily would be that neither has shown himself entitled to special consideration of a court of equity. The details of the disputes would serve no good purpose. Perhaps, however, it needs to be emphasized that the controversy is between majority and minority stockholders as to dissolution of the corporation, and

unapproved personal sins of contentious members are not to be visited upon their innocent associates nor used to destroy their property rights.

The applicable law of this State may be summed up in a quotation from the opinion of Mr. Justice CLARK in *Edison* v. *Fleckenstein Pump Co.*, 249 Mich. 234, in which the authorities are cited:

"There is no doubt that in certain exceptional cases, such as relieving from fraud, or breach of trust, a court of equity may in its inherent power wind up the affairs of a corporation as an incident to adequate relief. * * *

"But in the absence of all such exceptional circumstances the equity court, in its inherent power, may not dissolve a corporation, wind up its affairs, and, for that purpose alone, sequester corporate property."

Dissolution is not a remedy to be lightly decreed. The court has ample power in other ways to give relief for substantially all corporate ills. See *Turner* v. *Calumet & Hecla Mining Co.*, 187 Mich. 238. It may require an accounting for misappropriation of funds, secret profits, and the like. It may restrain or compel the corporation and its officers to lawful conduct, and, ordinarily, protect the stockholders in all their rights without dissolution. Dissolution is a last-resort remedy, to be applied when no other will give relief.

The ultimate test of dissolution is that, with any other remedy, the corporation cannot be made to function for the purpose of its creation. The test of failure of corporate purpose is whether ruin will inevitably follow continuance of the management. 43 A. L. R. 305, note.

Undoubtedly, the case presents some conduct by the majority stockholders for which a court of equity would provide a remedy, notably the failure to hold

stockholders' meetings in 1930 and 1931, prevented by the majority absenting themselves. Perhaps the court, on showing that the plan to institute this suit was concealed from some of the directors, would have dismissed the bill. It may be that some of David's conduct would warrant proceedings against him personally. But the record discloses no act of the majority which, needing correction, could not be remedied by the ordinary processes of the court. And there are outstanding facts, most of which are undisputed, which preclude the remedy of dissolution.

1. Dissolution is opposed by six stockholders owning over five-sevenths of the stock. It is asked by two stockholders. The contrast between them, in respect of their regard for the corporate good, does not incline a court of equity in favor of the minority. The minority complain of loans of $5,000 by the corporation to each of two of the majority, while each minority member owes the corporation over $100,000. The majority advanced $40,000 to save the corporate property from execution and mortgage sale. The minority refused to contribute, and would have permitted loss of most of the corporation property. To save the corporation for the benefit of the minority as well as themselves, four majority members obligated themselves personally for $750,000 on the corporation mortgage debt. The minority assumed nothing.

The majority oppose dissolution for the valid reasons that they consider the diversification of properties through corporate control more profitable and more likely to conserve the assets than individual ownership; and also because some of them feel unable or unwilling to manage separate properties. The minority are concerned with obtaining personal control and individual ownership.

In spite of all the family quarrels, the majority have shown no disposition to defraud the minority of their rights in the corporation. On the contrary, they have sought bases to buy the minority interests and have contracted with Julia for her stock. And Arthur attacked the contract as illegal in a suit decided in 261 Mich. 302.

2. It is not claimed that any member of the majority or any other officer or stockholder has misappropriated any property or funds of the corporation. The nearest to such claim is complaint of David Stott's salary of $6,000 per year as president, but it was regularly voted and has not been shown to be excessive. Complaint is also made of loans to other corporations in which all the parties are interested, but they were all sanctioned by all the parties.

3. The management has been selected and is supported by the majority of stockholders. It is not shown to be grossly incompetent, nor, indeed, incompetent at all.

The record of the corporation as to profits demonstrates competent management. Whether other persons could have produced more earnings over a period of years is not only not the test of competent management but must necessarily be largely or wholly speculative.

The specific instance of claimed incompetency which the minority stress is in the erection and financing of the David Stott Building. Because of the turn in business in 1929, the building may have been a mistake, although Danahey, whose ability and integrity are not questioned, denies it. In any event, it was no greater error than a multitude of shrewd business men made at the time. The testimony does not identify any person, anywhere, who sensed and appraised the coming depression and fully put his house in order.

It may have been a mistake to borrow $725,000 on short-time paper to complete the building, but, unless the management must be charged with knowledge that a depression was near, the loans were not out of proportion to the assets of the corporation. Moreover, it is common knowledge that a building costs more than the architect represents.

A striking feature of the case is that there is scant showing on the claim of incompetent management except through the opinion of minority members and on the ground that the policies of the minority did not prevail. Not only is it the law that the minority have not the right to determine policies as against the will of the majority, but the record indicates that the minority, in presenting policies, were more concerned with obstructing the will of the majority than they were in constructive regard for the corporation.

4. The corporate purpose has not failed. The Stott Realty Company is a going concern. When the cross-bills were filed, and afterwards, it was profitable. So far as the record shows, it is able to pay its current liabilities, at least as readily as most corporations. It has failed to perform only the one function of executing mortgages, and such failure has been temporary and due to the refusal of the minority to assent.

No one can surely prophesy what the present economic depression will bring to any concern. The corporation may lose all its property by foreclosure and execution. But "hard times" is not a cause for dissolution. And the view expressed by some of the witnesses seems sensible—that collective control of the properties by the corporation, so that one may aid another, is more likely to prevent ultimate loss than separate ownership of heavily-mortgaged par-

cels. In any event, ruin of the corporation or loss to the stockholders is not inevitable from the management of the corporation by the majority. If serious loss occurs, not due to the depression, the record indicates it is most likely to result from the dissension of the minority stockholders and unfounded litigation to be brought by them.

In our opinion, the case presents no right to the remedy of dissolution.

Decree will be reversed, and one will be entered dismissing the bill and cross-bills, providing for the discharge of the receiver, and remanding the case to the circuit court to settle accounts, with costs to plaintiffs against Arthur and Julia.

McDONALD, C. J., and CLARK, POTTER, SHARPE, NORTH, and WIEST, JJ., concurred. BUTZEL, J., did not sit.