*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LOREN E. PITSCH, JR., and GARY L. PITSCH,

Plaintiffs-Appellants,

v

PITSCH HOLDING COMPANY, INC., STEVEN B. PITSCH, LAURA M. PITSCH, and LEWIS D. PITSCH,

Defendants-Appellees.

UNPUBLISHED
May 12, 2022

No. 356184
Kent Circuit Court
LC No. 07-004719-CR

Before: GLEICHER, C.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

In this now 15-year-old litigation, the trial court was most recently tasked with resolving a shareholder deadlock. The trial court ordered plaintiffs Loren E. Pitsch and Gary L. Pitsch to sell their stock in Pitsch Holding Company, Inc. (PHC) to defendants PHC, Steven B. Pitsch, Laura M. Pitsch and Lewis D. Pitsch. Although plaintiffs contend that the forced stock sale violated this Court's remand instructions, this Court did not limit the trial court's resolution to a corporate dissolution. And plaintiffs' challenges to the court's valuation of the company shares are similarly without merit. We affirm.

## I. BACKGROUND

This appeal is the latest to arise out of a long and bitter dispute over control of a family-owned business. The individual parties are siblings who are shareholders and past or present officers and directors of PHC. Plaintiffs Loren and Gary Pitsch were terminated from their active leadership roles at PHC by defendants Steven, Laura, and Lewis Pitsch. However, Loren and Gary continued serving as voting board members. We discussed the history of this dispute in a 2018 unpublished opinion. *Pitsch v Pitsch Holding Co, Inc*, unpublished per curiam opinion of the Court of Appeals, issued November 29, 2018 (Docket Nos. 340402, 340494) (*Pitsch I*), lv den *Pitsch v Pitsch Holding Co, Inc*, 504 Mich 972 (2019). Relevant to the instant appeal are the last two paragraphs of that decision, in which we addressed the company's shareholder deadlock as follows:

Finally, both sides argue that the trial court did not properly resolve their deadlock, and each side advances their own suggestion regarding how the deadlock should be resolved. We agree that the trial court did not resolve the deadlock. The court instructed the parties to comply with certain terms set forth in the 1993 shareholder agreement, but acknowledged that it could not force the parties to engage in the process. By doing this, the trial court essentially left the parties where they have been for the past decade: fully aware of the shareholder agreement, but each side unwilling to follow its procedures to settle their dispute unless the other side agrees to additional, objectionable provisions.

At one time or another during the course of this litigation, both sides have asked the trial court to dissolve the company. When plaintiffs filed their complaint in 2007, they asked the court to "appoint a temporary receiver to manage the company until the deadlock could be broken or to order the company dissolved and liquidated." In October 2010, defendants filed a motion for dissolution. The trial court has consistently declined to dissolve the company because of its profitability and out of respect for the vision of the parties' parents to create a successful business that would provide financial security for their children. As admirable as these impulses may be, given the unique circumstances of this case, we believe it is time to give the parties what they have requested. Accordingly, we remand this matter to the circuit court so that the court may order dissolution of the company. [*Id*. at 18-19.]

On remand, plaintiffs moved for the appointment of a receiver empowered to take all steps necessary to dissolve PHC. Defendants did not oppose dissolution but asked that a receiver not be immediately appointed. They asked the trial court to pursue dissolution in a way that would maximize profit for each of the shareholders, protect jobs, and allow for the continuation of operations. They urged the court to seek proposals for dissolution from the parties. At the hearing on plaintiffs' motion, the parties agreed to the appointment of a special master, with certain conditions. In accordance with discussions at the hearing, the trial court appointed Amicus Management as special master, "authorized and directed to conduct [an] investigation into the finances and operations of [PHC] for the purpose of making recommendations to the court regarding asset valuation and proposed methods for a disposition of [PHC] and/or its assets."

After nearly a year of data gathering, analysis, and discussion, Amicus reached a valuation of $1,859,923 per shareholder if one side sold to the other, and informed the parties that they would receive much less if the company went through dissolution and liquidation. All the individual parties were willing to sell their stock at that price, but initially no one was willing to purchase the stock of the opposing parties. Amicus eventually convinced defendants to purchase plaintiffs' stock. But plaintiffs had a sticking point. In 2007, defendants began making cash advances to plaintiffs toward the eventual purchase of their shares. The cash advance agreement provided that these sums would be offset from the eventual purchase price. And per the agreement, as defendants did not sell their stock by April 1, 2007, 5% interest accumulated. Plaintiffs refused to sell unless defendants waived the setoff and interest obligations. Defendants sought to compel plaintiffs' sale, but plaintiffs retorted that a forced stock sale exceeded the trial court's authority on remand. Plaintiffs argued that the scope of review on remand was restricted to ordering the dissolution of PHC.

The trial court heard testimony from Bernard Klukowski, an Amicus accountant and the project manager for the PHC valuation. Klukowski explained how he arrived at the value of the stock per shareholder and opined that the recommended forced sale of stock was the best way to maximize value. Liquidation during corporate dissolution would result in significantly less money going to the shareholders because of unknowns such as the consequences of defaulting on millions of dollars in contracts, changes in the real estate market, financing for potential buyers of the company, and the length of time it could take to sell the company's assets. Liquidation would also include significant ongoing legal and receivership fees. Klukowski acknowledged that his valuation did not account for the cash advance receivables, the value of noncompetition agreements, or a going concern value, and that certain expenses deducted from the value of PHC's assets would not be incurred under the present forced-sale scenario.

Daniel Yeomans, Amicus's president and Klukowski's supervisor, agreed with Klukowski's recommendation and with his assessment of the risks of selling the company through liquidation and dissolution rather than through a stock sale. He testified that the modified liquidation value was close to the middle between the company's fair market value and its liquidation value, and opined that a stock sale was the most effective, least expensive, and safest means of resolving the business. Yeomans admitted that the valuation did not account for intangibles, such as good will, ongoing contracts, an existing customer list, and going concern value, nor did it include a value for covenants not to compete from Loren and Gary. Yeomans further testified that the downward adjustment Amicus made in PHC's value to account for possible tax consequences of a liquidation sale would be unnecessary if defendants purchased plaintiffs' stock.

The trial court ultimately determined that its authority on remand was not limited to dissolving PHC. The court adopted Amicus's recommendation that plaintiffs sell their stock to defendants for $1,859,923 per shareholder. The court adjusted the amount due plaintiffs by offsetting what they owed PHC under the cash advance agreement, and then added $159,030 to the value of each plaintiff's share.[1]

After unsuccessful motions for postjudgment relief, plaintiffs appealed in this Court.

## II. AUTHORITY ON REMAND

Plaintiffs first argue that the trial court was required to dissolve and liquidate PHC on remand following *Pitsch I*. We review de novo whether a trial court followed this Court's instructions on remand. *Lenawee Co v Wagley*, 301 Mich App 134, 149; 836 NW2d 193 (2013). "Interpreting the meaning of a court order involves questions of law that are reviewed de novo." *Augustine v Allstate Ins Co*, 292 Mich App 408, 423; 807 NW2d (2011).

> The power of the lower court on remand is to take such action as law and justice may require so long as it is not inconsistent with the judgment of the appellate court. . . . [W]hen an appellate court gives clear instructions in its remand order, it

---

[1] Plaintiffs owed the company $795,150 under the cash advance agreement. Adding that amount to the company's value then would increase each shareholder's value by $159,030.

is improper for a lower court to exceed the scope of the order. It is the duty of the lower court or tribunal, on remand, to comply strictly with the mandate of the appellate court. [*K&K Constr Inc v Dep't of Environmental Quality*, 267 Mich App 523, 544-545; 705 NW2d 365 (2005) (quotation marks and citations omitted).]

As noted, *Pitsch I* remanded the "matter to the circuit court so that the court may order dissolution of the company." *Pitsch I* at 19. MCL 450.1833 provides that "[e]xcept as a court may otherwise direct, a dissolved corporation shall continue its corporate existence but shall not carry on business except for the purpose of winding up its affairs by" certain delineated activities. The trial court in this case did not order the dissolution of the corporation and the winding up of its affairs. PHC will remain a fully functioning corporation, just without Loren's and Gary's participation and ownership. But was the court required to order dissolution?

This Court well understands the different meanings of the permissive "may" and the mandatory "shall" or "must." See *Grabow v Macomb Twp*, 270 Mich App 222, 229; 714 NW2d 674 (2006). This Court frequently expresses specific remand instructions in terms of what the trial court "shall" or "shall not" do. See, e.g., *Allen Park Retirees Ass'n, Inc v Allen Park*, 329 Mich App 430, 446; 942 NW2d 618 (2019) (stating what the trial court "shall consider" and "shall not consider" on remand); *Spect Imaging, Inc v Allstate Ins Co*, 246 Mich App 568, 578; 633 NW2d 461 (2001) (instructing that "[o]n remand, the trial court shall conduct an evidentiary hearing . . . ."). Had the *Pitsch I* panel intended to restrict the trial court's authority on remand to dissolving PHC, the panel could have stated clearly and specifically that "on remand, the trial court shall dissolve PHC." It did not.

However, plaintiffs argue that in the context of *Pitsch I*, "may" is synonymous with "shall" or "must." Their argument is not completely without merit. Dictionaries acknowledge that "may" can mean "shall" or "must" when required by "sense, purpose, or policy" requirements, especially in the context of statutory interpretation. *Merriam-Webster's College Dictionary* (11th ed); *Black's Law Dictionary* (11th ed) ("In dozens of cases, courts have held *may* to be synonymous with *shall* or *must*, usu. in an effort to effectuate what is said to be legislative intent."). In *Fink v Detroit*, 124 Mich App 44, 49; 333 NW2d 376 (1983), this Court explained, "When the context indicates otherwise, 'may' can have the effect of 'must' or 'shall.' "

In *Pitsch I*, this Court remarked that at one time or another both sides had asked the trial court to resolve the deadlock issue by dissolving the company, but the trial court had consistently rejected that solution. This Court then stated that it "believe[d] that it was time to give the parties what they have requested," and remanded the matter "to the circuit court so that the court may order dissolution of the company." *Pitsch I* at 18-19. *Pitsch I* could be read as ordering the trial court "to give the parties what they have requested," i.e. dissolution.

However, as indicated in the first paragraph under the "Deadlock" heading, the issue before this Court was not whether PHC should be dissolved, but whether the trial court had properly resolved the parties' deadlock. *Id*. at 18. The panel agreed that the trial court had not properly resolved the issue and stated that each side offered its own suggestions regarding how it should be resolved. As already indicated, the panel commented in the second paragraph that dissolution was one solution to the deadlock that both sides had suggested at different times, but that the trial court had resisted. *Id*. at 18-19. Reading the two paragraphs together in the context of the shareholder

deadlock issue, the panel's comment about giving the parties what they requested could be read as instructing the trial court to resolve the deadlock issue, even if it meant adopting a solution that it had previously resisted. The trial court proceeded on a reasonable interpretation of this Court's opinion and order, but opted against dissolution. This did not exceed the scope of the trial court's authority on remand.

Yet plaintiffs contend that this Court must have intended to order dissolution as that was the sole relief available to resolve a shareholder deadlock under MCL 450.1823. The statutory language does not require dissolution when deadlock occurs, but states that a corporation "may be dissolved by judgment" when certain criteria are met. Indeed, it has long been held that the equitable remedy of dissolution is a remedy of last resort. See *Stott Realty Co v Orloff*, 262 Mich 375, 381; 247 NW 698 (1933). When resolving a shareholder deadlock in a close corporation such as PHC, a court may resort to equitable remedies other than those provided by statute. 6 Am Jur, Proof of Facts, 2d, § 387. "Among equitable remedies that may be used to provide relief without ordering dissolution or liquidation [is] ordering one disputing faction to purchase the shares of the other faction at a price to be determined by a stated formula or which the court finds to be fair and reasonable." *Id*. Accordingly, the trial court's authority cannot be limited in the manner suggested by plaintiffs.

## III. VALUATION

Plaintiffs next challenge the per-shareholder value set by the trial court. This was a factual question, which we review for clear error. *Jansen v Jansen*, 205 Mich App 169, 171; 517 NW2d 275 (1994). In doing so, we give due regard "to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). A finding is clearly erroneous when after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "A trial court has great latitude in determining the value of stock in closely held corporations, and where a trial court's valuation . . . is within the range established by the proofs, no clear error is present." *Jansen*, 205 Mich App at 171.

The court appointed Amicus as "special master" empowered "to conduct [an] investigation into the finances and operations of [PHC] for the purpose of making recommendations to the court regarding asset valuation and proposed methods for a disposition of [PHC] and/or its assets." The court did not limit Amicus to setting a liquidation value or the value of the company or its assets if sold in a free market. Rather, the trial court intended Amicus to evaluate PHC in a manner that would maximize value to the individual shareholders. Plaintiffs have never cited any specific error in Amicus's reasoning, assumptions, valuation techniques, calculations, or conclusions. Rather, the essence of plaintiffs' challenge is to the ultimate value selected by the trial court out of the various valuation methods employed by Amicus.

At a February 18, 2019 hearing, Gary's counsel expressly stated his desire for Amicus to do the valuation and to keep PHC intact. Loren's attorney added that Amicus "really do[es] a good job at maximizing dollars." And the circuit court stated, "I have had nothing but incredibly positive experiences . . . with Amicus." Record evidence supports that Amicus is an experienced company that has "help[ed] reorganization" and "evaluat[ed] exit strategies" for businesses involved in litigation approximately 700 to 800 times. Amicus prepared the valuation as instructed. The court

found Klukowski's testimony compelling, stating that he used "well-accepted valuation techniques," considered "three separate measures of value," and "effectively defended his choice of the modified-liquidation value during his testimony."

Plaintiffs contend that a valuation of PHC's assets if sold at market prices should have been used. However, they do not explain why they believe the company would net the appraised value of its assets at liquidation or how using the net appraised value of the company's assets was more likely to meet the goal of maximizing the company's value to the shareholders. Plaintiffs cannot simply announce their position and leave it to this Court to discover and rationalize the basis for their claims. See *Bronson Methodist Hosp v Mich Assigned Claims Facility*, 298 Mich App 192, 199; 826 NW2d 197 (2012).

Plaintiffs also argue that the trial court erred by adopting Amicus's valuation because it reduced PHC's value by costs that would only be incurred if the company were liquidated, which it was not. Amicus's valuation did include expenses that would not be incurred in a forced stock sale. Klukowski testified that if there were a forced sale of stock, PHC would not incur certain real estate or equipment liquidation costs, and Yeomans testified that if defendants purchased plaintiffs' stock, there would be no tax consequences to the company. Removing these expenses from Amicus's valuation would add $1,702,483 to the company's value, and approximately $344,497 to the value of each shareholder's stock, bringing the total value of each shareholder's stock to approximately $2.2 million (before adjustments for the cash advance repayments). However, it is not clear that the trial court erred by declining to add these expenses back into the company's value. Amicus was tasked with determining "what we will net if we go down on a liquidation strategy." After reaching a number, Amicus worked to convince one side or the other to buy the other side's stock. Significant negotiations and compromises were made before defendants agreed to purchase plaintiffs' shares.

Considering the trial court's goal of resolving the deadlock issue in a way that maximized value to the shareholders, Klukowski's testimony that a forced sale would do that, Yeomans' testimony that $1,859,923 was a "very fair price," and all parties' initial willingness to sell their stock for that amount, we are not left with a "definite and firm conviction" that the trial court erred.

IV. INTEREST ON CASH ADVANCE PAYMENTS

Plaintiffs contend that PHC is not entitled to interest on the cash advances made to them under the cash advance agreement. We review de novo questions concerning the proper interpretation and application of contractual language. *Bronson Health Care Group, Inc v USAA Cas Ins Co*, 335 Mich App 25, 31; 966 NW2d 393 (2020).

The parties executed a cash advance agreement in February 2007, during negotiations for plaintiffs to sell their stock back to PHC. The agreement states that PHC would pay Loren $1,050 a week, and Gary $1,400 weekly, "as advances against the Purchase Price of the Selling Shareholders' non-voting common stock in [PHC] if and when the Selling Stockholders sell such stock to [PHC]." The sum of these advances would be "credited on [PHC's] purchase price" of plaintiffs' nonvoting common stock. The agreement continues:

If such an agreement is not reached by [April 1,][2] 2007, such payments will cease and if no other obligations are determined to be owed to the Selling Shareholder, each Selling Shareholder will repay such advances made to that Selling Shareholder to [PHC] with interest at 5% per annum from the date of each advance payable upon demand by [PHC] or resolution of the claims by a court of competent jurisdiction. [Emphasis omitted.]

The plain language of the cash advance agreement requires plaintiffs to pay interest on the cash advances as they did not reach an agreement to sell their stock *before* April 1, 2007. The circuit court did not err in upholding that contract.

## V. SHAREHOLDER AGREEMENT

Finally, plaintiffs question whether certain provisions in the shareholder agreement survive the trial court's order forcing plaintiffs to sell their stock in PHC to defendants. Of particular concern to Gary is the continued viability of the agreement's noncompetition provision.

Plaintiffs first raised this issue in motions for reconsideration filed after the trial court issued its findings of fact, conclusions of law, and verdict, but before the court entered its judgment on the verdict. An issue is preserved for appeal if the litigant raises it in the trial court. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). However, it is generally insufficient for the purposes of preservation to raise an issue for the first time in a motion for reconsideration. See *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 519; 773 NW2d 758 (2009). Although this Court may exercise its discretion to review an unpreserved issue, our Supreme Court has warned that this discretion should be exercised quite sparingly, *Napier v Jacobs*, 429 Mich 222, 233; 414 NW2d 862 (1987), and only in the most exceptional of cases, *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234 n 23; 507 NW2d 422 (1993). This is not such a case.[3]

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra

---

[2] The original date was March 1, 2007, but "March 1" was stricken and "April 1" was written in the margin.

[3] Plaintiffs also contend in the statement of questions presented that the trial court erroneously declined to reopen proofs to consider "1099s issued to the plaintiffs by [PHC] and transfers of assets by [PHC]." In the body of their appellate brief, however, defendants assert that this issue is either not ripe for review or moot. This claim was thereby abandoned and we need not address it. See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999).